Commonwealth of Pennsylvania, Acting by Attorney General Israel Packel, Plaintiff, v. James Tolleson and Rodney Tolleson, Defendants.
(Second Opinion)

Argued March 4, 1974, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*George S. Test,* Deputy Attorney General, for plaintiff.

*James H. Joseph,* with him *Donald S. Hershman* and *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig,* for defendants.

OPINION BY JUDGE KRAMER, June 19, 1974:

This matter comes within the original jurisdiction of this Court. The Commonwealth of Pennsylvania (Commonwealth), acting through its Attorney General, filed a complaint in equity against James E. Tolleson and Rodney W. Tolleson (referred to collectively as Tollesons and individually by their given and surnames) seeking an injunction to restrain certain activities alleged to be in violation of the Unfair Trade Practices and Consumer Protection Law (hereinafter Act), Act of December 17, 1968, P. L. 1224, 73 P.S. §201-1 et seq. Filed simultaneously herewith is an opinion and order of this Court granting the permanent injunction prayed for by the Commonwealth. Also filed simultaneously herewith is an opinion of this Court arising out of an appeal by the Tollesons and an organization known as American Be Independent from the levying of civil penalties by the Court of Common Pleas of Erie County. We have dealt with these matters in separate opinions in the interest of clarity. This opinion will deal with four separate petitions filed by the Commonwealth praying for the imposition of civil penalties on the Tollesons for alleged violations of a consent order issued by this Court.

When the complaint was filed on February 23, 1973, this Court, after hearing argument from counsel for the Commonwealth and counsel for the Tollesons, issued a Special Injunction prohibiting the Tollesons "from conducting any solicitations, promotional activities, sales of services, or any of the activities alleged to be carried on in the allegations of the Complaint filed herein in the Commonwealth of Pennsylvania." That same order directed that a hearing be held on February 26, 1973 for the purposes of determining whether a preliminary injunction should be issued. The hearing date was continued at the request of both parties until March 14, 1973, when the parties jointly presented to

the Court for its approval a stipulation agreeing to the terms of a consent order. On March 15, 1973, after review of the record, this Court approved the proffered Consent Decree which contained the following provisions:

"AND NOW, this 15th day of March 1973, based upon the executed stipulation of the parties and upon joint motion of counsel, it is hereby ordered that the Special Injunction heretofore issued by this Court on February 23, 1973, as thereafter extended, be and the same hereby is continued in full force and effect in all respects as a Preliminary Injunction until the hearing and determination of the above entitled civil action, except as is herein below set forth:

"1. Executive members of Exciting Life, Inc. who had paid for such membership prior to February 23, 1973 and Executive member [sic] of Century 2000, Inc. who were members thereof prior to February 23, 1973, may (if such Century 2000, Inc. executive members agree and consent), be continued as or offered and made executive members of Exciting Life, Inc. as the case may be. Except as such executive members of Century 2000, Inc. agree and consent thereto, and except for Exciting Life, Inc. executive members who were such prior to February 23, 1973 James Tolleson, Rodney Tolleson, the above named defendants, their agents, servants, employees, representatives and organizations which they control or direct, shall not sell, solicit, promote or offer, create, confer or appoint any executive members in Exciting Life, Inc. or any other entity.

"2. Defendants, their agents and representatives, through any corporate or other device, shall not engage in any of the following acts or practices in any business enterprises presently in existence or which shall come into existence affecting residents of the Common-

wealth, whether or not such acts or practices take place in Pennsylvania or elsewhere:

"a. Paying, or promising to pay, any fee, compensation, reward or other remuneration, either directly or indirectly, to any person for the procurement of a contract of purchase of something of value, whether intrinsic or extrinsic, with others or for the procurement of names of potential customers, such as would violate subsection (xii) of Section 2(4) of the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P. L.   , No. 387;

"b. Making any representations directly or through their agents, employees or representatives, through distributors, state developers, Executive Members of any other subsequently created franchises or investors relating to earnings or earnings potential which are not based upon the experience of a substantial number of people engaged in the same or similar enterprise and working for Defendants or any one of them;

"c. Failing to clearly and conspicuously disclose to all present and future buyers or investors in any of the Defendants' business enterprises the proposed and actual application of all fees or their monies which are required as an initial or subsequent payment or investment;

"d. Misrepresenting any or all of Defendants' actual possessions, past, present or future, and the true nature of Defendants' interest in any or all of said possessions or misrepresent any of Defendants' earnings, past, present or future;

"e. Engaging in any high pressure salesmanship, either directly or through agents, employees or representatives;

"f. Distributing by any means, including but not limited to, mailing, hand deliveries, advertisements in any known or to be developed media, any of the letters or brochures attached hereto and marked Exhibits 'D',

'F', 'H', and 'I', or otherwise publish in any form or manner the same or similar information contained in the said exhibits, which aforesaid materials do not disclose the general nature, kind or type of business or goods or services to be sold;

"g. Distributing or displaying excessive currency or expensive possessions, whether owned or not, to others or in the presence of others while engaged in any promotional activities in the Commonwealth or outside the Commonwealth but in the presence of residents of the Commonwealth;

"h. Recommending or encouraging any person to make a false statement to any financial institution or any person for the purpose of inducing said financial institution or any person to loan money;

"i. Recommending, encouraging or in any way condoning the misrepresentation of the financial status or success or achievement of another when such person is engaged in any promotional activities of Defendants or one of Defendants' agents;

"j. Engaging, promoting, planning, designing or in any way perpetuating sales presentations to individuals or groups of individuals which contain and emphasize the use of excessive enthusiasm or any sales tactics which are designed to break down an individual's sales resistance by implementing emotional and psychological pressures made solely for the purpose of inducing people into paying or investing property in the purchase of goods, services or any other thing of value, whether intrinsic or extrinsic;

"k. Misrepresenting the true purpose, nature or content of any legal documents utilized by the Defendants in the promotion and sale of any goods, services or any other thing of value, whether intrinsic or extrinsic;

"l. Conducting, directly, promoting, designing or condoning any sales presentation either to an individu-

al or to a group of individuals which includes the use of speakers who recount their swift financial, emotional or spiritual success as a result of becoming involved in any of Defendants' enterprises, past, present or future, unless the statements made are true and relevant to the situation of the persons to whom the conversation is directed, or otherwise such differences in situations as exist are clearly explained;

"m. Misrepresenting, directly or by implication, the fair market value of any goods, services or any other thing of value promoted by Defendants;

"n. Misrepresenting, directly or by implication, the extent or nature of ownership Defendants or either one of them possess or control in any business enterprises or misrepresent the quality, quantity, characteristics, ingredients, sponsorship or approval of any goods, services, business enterprises or any other thing of value;

"o. Failing to disclose any and all costs which will be incurred by buyers or investors in furtherance of their investments or franchises;

"p. Misrepresenting the amount of effort an investor in one of Defendants' enterprises will have to expend in order to achieve financial success.

"q. Failing to disclose to any and all prospective purchasers who may inquire about Defendants' history and background that Defendants have been agents of Koscot Interplanetary, Inc., Glenn W. Turner, Century 2000, Exciting Life and the existing financial status of all such enterprises and persons to the extent of Defendants' knowledge;

"r. Representing that Defendants or any of the Defendants' enterprises intend to provide their investors or buyers with any form or forms of advertising unless and until Defendants or their agents have obtained firm commitments from all media involved for the placement and publication of such advertising;

"s. Misrepresenting the cost of any merchandise, services or any other thing of value which Defendants promote for sale or sell, either directly or through franchises or other third parties;

"t. Representing that Defendants own or are negotiating for the ownership of any goods, services or any other things of value unless such is, in fact, the case;

"u. (1) Make any claim in any advertising, promotional material, or disclosure statement, or in any oral sales presentation, solicitation or discussion between a Seller's representatives and prospective purchasers, for which the Seller does not have substantiation in its possession, which substantiation shall be made available to prospective purchasers or the Bureau of Consumer Protection or its staff upon demand. This provision applies, but is not limited, to statements concerning the experience or qualifications, needed for success as a purchaser;

"(2) Make any claim in any advertising or promotional material, or in any oral sales presentation, solicitation or discussion between a Seller's representations and prospective purchasers, which (directly or by implication) contradicts any of the statements required to be disclosed pursuant to this Preliminary Injunction.

"v. Fail to include immediately above and on the same page as the purchaser's signature line of any contract establishing or confirming a purchase agreement, the following statement which clearly stands out from any other print in the body of such contract, the following:

"NOTICE: YOU ARE ENTITLED TO CERTAIN IMPORTANT INFORMATION CONCERNING THIS TRANSACTION: IT IS IN YOUR BEST INTEREST TO STUDY SUCH INFORMATION. YOU MAY CANCEL THIS CONTRACT FOR ANY REASON WITH-

IN SEVEN (7) BUSINESS DAYS AFTER EITHER SIGNING THIS CONTRACT OR RECEIVING THE REQUIRED INFORMATION, WHICHEVER OCCURS LATER. If you choose to cancel, you will be entitled to receive a full refund within seven (7) business days after Seller receives notice of your cancellation. Cancellation must be in writing and mailed to the address given below. For your own protection you may wish to use certified mail with return receipt requested, or a telegram, either of which should be sent to the address below. (Seller will insert here the address and telephone number to which such notices should be sent).

"w. Fail to cancel any contract for which a notice of cancellation was sent as provided above within seven (7) business days after either the contract's execution, or the purchaser's receipt of all required information, whichever occurs later, or to fail to refund any money paid by purchaser within seven (7) business days after the date of receipt of such notice of cancellation;

"y. Fail to furnish the prospective purchaser, upon request at any time and, in the absence of any request, before consummation of any agreement, with a copy of the purchase agreement proposed to be used;

"z. Take, accept or negotiate any promissory note or other instrument of indebtedness which contains:

"(1) Any waiver of rights or remedies which the purchaser may have against the Seller or other person acting in his behalf; or

"(2) Any provision by which the purchaser agrees not to assert against Seller a claim or defense arising out of the transaction or agrees not to assert against an assignee such a claim or defense.

"This provision (z) shall apply to any transaction in which the Seller or any of its agents or representatives took any part whatsoever, including, but not by way of limitation, the actual negotiation of such in-

strument, or any referral to or arrangement with any other person with whom a purchaser negotiates such instrument, but does not apply to any transaction entered into between a purchaser and another person wholly free of any involvement by the Seller or its agents or representatives;

"aa. Make a misstatement of a material fact or omit any material fact which, if stated, would have made statements that were made untrue or misleading under the circumstances in the disclosure of information required by this Consent Petition.

"3. In the sale of any and all of Defendants' services or products, Defendants shall make available to purchasers a brief description of the following information in a written form which shall be provided to all prospective purchasers of Defendants' services or products:

"a. A statement of the history of the company or other enterprise through which Defendants are offering the said services or products;

"b. A statement of the entire purchase price for the services or products, including any foresceable [sic] expenses which will be incurred by purchaser;

"c. An explicit statement of all services and products which will be made available to purchasers for the stated price;

"d. If any price comparisons are utilized by Defendants, their agents or representatives, comparing the value of Defendants' services or products to the same or similar services or products, Defendants shall include such comparisons in such information provided to purchasers, including identification of specific services or products which are used in Defendants' price comparisons;

"e. If any services which are to be provided depend upon the ability of Defendants to produce certain training or other services, including, but not limited to, air

travel or any other means or mode of transportation, Defendants shall provide prospective purchasers with information concerning the extent of ownership or control Defendants have over the actual performance of the services to be provided by Defendants.

"Provided however, that any price comparisons utilized by Defendants as provided in subparagraph (d) hereof shall be supported by proof of the truth and accuracy of such price comparisons which shall be supplied to the Bureau of Consumer Protection if requested.

"4. Subjected to the provisions of this preliminary injunction Defendants, James and Rodney Tolleson, their agents, servants, employees, representatives, and organizations which they control or direct (including executive members thereof) shall be entitled to offer, sell, solicit and promote the sale of family memberships in Exciting Life, Inc. and shall be permitted to cause to be offered, sold, or solicited family memberships in Exciting Life, Inc.

"5. The parties hereto agree that subject to the Court's further orders upon its own motion, no hearing in this case shall be held before March 28, 1973 and until either or both parties, by praecipe to the President Judge of this court, indicate that the matter is ready for hearing.

"6. All persons subject to this preliminary injunction have agreed and represented to the Court by their attorneys that this Order shall be construed to permit the activities mentioned in paragraphs 1 and 4 hereof and none other, and the activities set forth and permitted in paragraph 4 hereof shall be subject to the express requirements of all the other paragraphs of the Order and the applicable laws of the Commonwealth. Further, the disclosure statement required by paragraph '3' hereof shall be furnished by hand delivery to a prospective purchaser prior to said purchaser making

any payment and shall be delivered unaccompanied with any other written material at the time of said delivery."

Following the filing of the March 15, 1973 Consent Decree, the Commonwealth filed the following petitions for the recovery of civil penalties:

1. Petition filed March 19, 1973.
2. Petition filed March 21, 1973.
3. Petition filed April 13, 1973.
4. Petition filed July 19, 1973.[1]

In addition, the Commonwealth filed yet another petition seeking the imposition of civil penalties against the Tollesons which was filed April 6, 1973 but at a different docket number, viz., No. 1106 C.D. 1972. Because that petition relates to a different order of this Court, it will be dealt with in a separate opinion.

One last procedural point must be made. The Tollesons filed no preliminary objections to any of the four petitions for civil penalties involved in this opinion and filed no answer to the first three petitions for civil penalties filed by the Commonwealth. The Tollesons did, however, file an answer to the July 19, 1973 petition for civil penalties.

Because all these matters relate to the same subject matter, the parties agreed, with the approval of the Court, that all of the petitions for civil penalties mentioned above and the injunction proceeding be consolidated for hearing. Therefore the testimony and evidence received at the hearings applied to all of these matters. Since the operations of the Tollesons about which the Commonwealth complains are fully explained and set forth in the opinion of this Court filed simultaneously herewith in the injunction proceeding, the reader is directed to that opinion. All of the findings

---

[1] There was an additional petition for civil penalties filed September 7, 1973 which by agreement of the parties is not the subject of this opinion.

of fact and conclusions of law contained in that opinion, which may be pertinent to the final adjudications herein, are made a part hereof by reference thereto. Obviously, however, additional findings of fact are necessary in this opinion to support the final adjudication.

As we noted in our opinion in the injunction proceeding, all of the witnesses for both the Commonwealth and the Tollesons were sequestered except for the Tollesons themselves. During the hearings the Commonwealth's witnesses were responsive to questioning and their testimony was surprisingly consistent. By comparison, the chancellor observed that the witnesses for the Tollesons and the Tollesons themselves were not responsive but rather were evasive and uncooperative under cross-examination. Based upon these observations, the chancellor has made his findings of fact. In the interest of clarity, the four petitions for civil penalties will be segregated by a separate and appropriate subtitle in the findings of fact.

### FINDINGS OF FACT

### Petition Filed March 19, 1973

A.(1) The Tollesons had notice of this Court's special injunction dated February 23, 1973, on that date and were represented by counsel before this Court on that same date.

A.(2) The Tollesons and their agents conducted a meeting on February 26, 1973 at which they made solicitations for the purpose of selling memberships in their organization known as Exciting Life.

A.(3) This meeting held on February 26, 1973 was held at the Holiday Inn in Wilkes-Barre, Pennsylvania.

A.(4) At this February 26, 1973 meeting, the Tollesons were represented by their agents operating under the name of Exciting Life.

A(5)   At this said meeting held February 26, 1973, the Tollesons through their agents attempted to sell memberships in Exciting Life.

Petition Filed March 21, 1973

B(1)   The Tollesons had notice of the Consent Decree dated March 15, 1973. The Tollesons, through their agents, conducted a sales meeting at the Abraham Lincoln Motel in Reading, Pennsylvania on March 15, 1973 at which they engaged in high-pressure salesmanship, used excessive group enthusiasm and employed sales tactics designed to break down a prospective member's sales resistance by implementing emotional and psychological pressures.

B(2)   At the March 15, 1973 meeting, market values were placed upon success seminars, motivation courses and travel clubs which did not have any basis in fact.

B(3)   At the March 15, 1973 meeting, the Tollesons, through their agents and in the presence of James Tolleson, made statements concerning trips which Exciting Life had already taken but which had not in fact taken place.

B(4)   At the said March 15, 1973 meeting, a brochure was distributed to prospective members in Exciting Life which stated that any money invested was nonrefundable.

B(5)   At the said meeting held March 15, 1973, the Tollesons and their agents did not provide to prospective members the information required in the Consent Decree (preliminary injunction) of this Court issued March 15, 1973.

B(6)   On March 16, 1973, the Tollesons and their agents conducted sales meetings at the Holiday Inn in York, Pennsylvania and at the Holiday House in Monroeville, Pennsylvania.   At each of those meetings the Tollesons, through their agents, stated values of ser-

vices to be rendered by Exciting Life which were not based on fact. Exaggerated and unsubstantiated statements concerning income were also made at these meetings by agents of the Tollesons. At the same meetings, none of the information required in the Consent Decree, dated March 15, 1973, was provided to prospective members by the Tollesons or their agents.

### Petition Filed April 13, 1973

C(1)   The Tollesons and their agents held many meetings subsequent to March 15, 1973 as listed by date hereinafter. At these meetings, high-pressure sales tactics and excessive enthusiasm were used in order to break down the prospects' sales resistance by implementing emotional and psychological pressures. The sole purpose of these meetings and these sales tactics was to induce people to purchase memberships in Exciting Life. At these meetings, the prospective members were not given the required information as set forth in the Consent Decree dated March 15, 1973. These meetings occurred on the following dates:

| | |
|---|---|
| March 19, 1973 | Monroeville, Pennsylvania |
| March 23, 1973 | Harrisburg, Pennsylvania |
| March 26, 1973 | Harrisburg, Pennsylvania |
| March 29, 1973 | Harrisburg, Pennsylvania |
| April 2, 1973 | Harrisburg, Pennsylvania |
| April 5, 1973 | Harrisburg, Pennsylvania |
| April 5, 1973 | Mechanicsburg, Pennsylvania |
| April 12, 1973 | Harrisburg, Pennsylvania |
| April 16, 1973 | Harrisburg, Pennsylvania |
| April 16, 1973 | Mechanicsburg, Pennsylvania |
| April 18, 1973 | Monroeville, Pennsylvania |
| April 19, 1973 | Harrisburg, Pennsylvania |
| April 23, 1973 | Harrisburg, Pennsylvania |
| April 30, 1973 | Harrisburg, Pennsylvania |
| May 5, 1973 | Harrisburg, Pennsylvania |
| May 14, 1973 | Mechanicsburg, Pennsylvania |
| May 14, 1973 | Harrisburg, Pennsylvania |

C(2)   Subsequent to March 15, 1973, the Tollesons and their agents distributed promotional material by mail which did not disclose the general nature, kind or type of business, goods or services to be sold.

## Petition Filed July 19, 1973

D(1)   The Tollesons and their agents conducted a series of meetings at the Sheraton Motor Inn located in Gettysburg, Pennsylvania on July 7 and 8, 1973.   At these meetings, high-pressure salesmanship and excessive enthusiasm were used in order to break down the prospective members' sales resistance by implementing emotional and psychological pressures.   The sole purpose of these meetings was to induce the prospective members to purchase memberships in Exciting Life.

D(2)   At these said meetings, the Tollesons and their agents solicited and sold executive memberships to persons from other states who attended these meetings which were located inside the boundaries of the Commonwealth of Pennsylvania.

D(3)   At these said meetings, the prospective members (including Pennsylvania residents) were offered regular memberships in Exciting Life and an opportunity to recover their $1,000 regular membership fee by bringing into the organization five new regular members for which they would receive $200 each. Prospective members were told at these meetings that after a regular member procured five new members, he would become a membership recruiter entitled to receive 20% of the fee obtained from those new members he personally recruited thereafter.   Prospects were also told that, as a membership recruiter, an individual was entitled to receive 10% of the fee obtained from those new members recruited by those persons he brought into Exciting Life.

D(4)   At these meetings, false and misleading statements were made concerning the income of exist-

ing members of Exciting Life and concerning the function of JET Travel Service, Inc. It was implied that JET Travel Service, Inc. would supply the jet aircraft needed for the numerous trips promised at said meetings. The false and misleading statements were intended by the Tollesons and their agents to encourage prospects (including Pennsylvania residents) to join Exciting Life.

D(5) At these meetings, attempts were made to sell stock in JET Travel Service, Inc. Prospects were told that the stock was unavailable through normal channels but that it could be purchased directly from Harry Galaida, the president of Exciting Life.

## DISCUSSION

We have discussed at the beginning of this opinion the procedures which led to the filing of the Consent Decree, set forth in toto above. We believe it important to stress the fact that the Consent Decree was agreed to by the parties and merely approved by this Court. The Tollesons cannot not now be heard to complain that the Consent Decree was not fair or that they did not understand it. The Consent Decree was partially of the Tollesons' making and they must live with it.

In paragraph 1 of the Consent Decree, there is a provision which states that the Tollesons and their agents, servants, employes, representatives and organizations which they control and direct "shall not sell, solicit, promote or offer, create, confer or appoint any executive member in Exciting Life, Inc. or any other entity." Somehow the Tollesons took it upon themselves, after having presented this provision to the Court, to sell executive memberships at meetings held inside the boundaries of this Commonwealth to citizens of other states. Although paragraph 2 of the Consent Decree restricts certain acts "affecting residents of the Commonwealth," the above-quoted section of paragraph

1 is a complete and absolute prohibition of *any* sales of *any* executive memberships. All sales and attempted sales of executive memberships at meetings in this Commonwealth were in direct violation of the Consent Decree. We want to emphasize the fact that the Consent Decree continued "in full force and effect" the provisions of the Special Injunction of February 23, 1973, except as otherwise specifically provided in the Consent Decree.

The record discloses that there was very little change in the modus operandi of the various meetings held subsequent to March 15, 1973. The meetings were still staged with false enthusiasm engendered by shills in strict accordance with a prepared script. Money and expensive property (usually rented) continued to be flashed at the meetings, and unsupported claims of great wealth continued to be made. The record indicates that a tape recording was made of all of these meetings. If the descriptions of the meetings by the Commonwealth's witnesses were inaccurate, then all the Tollesons needed to do was bring in their tapes and play them for the Court. This they did not do. As noted in our opinion in the injunction proceeding, all of the money that was paid by members to the Tollesons and their agents was paid into foreign corporations, which were not in privy with the members or the organization which they joined. Where the money is at this writing remains a mystery. We do know, from the prospectus prepared by the Tollesons' accountants and made a part of the record, that the balance sheets for the Tolleson companies shown therein disclose a paucity of assets.

## CONCLUSIONS OF LAW

### Applicable To All Petitions

A(1)  The Commonwealth, acting through its Attorney General, was a proper petitioner in these peti-

tions seeking the levying of civil penalties against the Tollesons.

A.(2)   The Tollesons were properly respondents subject to Section 8 of the Act, 73 P.S. §201-8, and to the Consent Decree issued by this Court on March 15, 1973.

A.(3)   The Tollesons have been engaged in business within the Commonwealth of Pennsylvania from at least July of 1971 to the date hereof through the several unregistered foreign corporations and fictitious names mentioned in the findings of fact in the injunction proceeding opinion filed simultaneously herewith.

A.(4)   The Tollesons carried out their business activities through the various officers, directors and officials of said organizations and through individuals called, among other things, regional directors, area directors, district directors, state developers, motivators, membership recruiters, team leaders, executive members, family members, and regular members.   All of these individuals were agents of the Tollesons.

A.(5)   The Tollesons were subject to the provisions of the Special Injunction dated February 23, 1973 and also to the additional provisions of the Consent Decree dated March 15, 1973.

A.(6)   At all of the sales meetings held between February 23, 1973 and March 15, 1973, the Tollesons and their agents violated the provisions of the Special Injunction.   At all of the sales meetings held subsequent to March 15, 1973, the Tollesons and their agents violated the provisions of the Special Injunction and the Consent Decree.

### Petition Filed March 19, 1973

A.(7)   The conclusions A.(1) through A.(6) mentioned above are applicable.

A.(8)   The meeting held by the Tollesons and their agents in connection with Exciting Life at the Holiday

Inn in Wilkes-Barre, Pennsylvania on February 26, 1973, violated the provisions of the Special Injunction issued by this Court on February 23, 1973.

### Petition Filed March 21, 1973

B(1)   The conclusions A(1) through A(6) noted above are applicable.

B(2)   At the meeting held by the Tollesons and their agents in connection with Exciting Life held at the Abraham Lincoln Motel in Reading, Pennsylvania on March 15, 1973, the Consent Decree dated March 15, 1973 was violated.

B(3)   At the meetings held by the Tollesons and their agents on March 16, 1973 at the Holiday House in Monroeville, Pennsylvania and at the Holiday Inn in York, Pennsylvania, the Consent Decree dated March 15, 1973 was violated.

### Petition Filed April 13, 1973

C(1)   The conclusions A(1) through A(6) set forth above are applicable.

C(2)   The mailing of solicitation letters which did not disclose the general nature, kind or type of business, goods or services to be sold, by the Tollesons and their agents subsequent to March 15, 1973, was in violation of the Consent Decree dated March 15, 1973.

C(3)   Meetings held by the Tollesons and their agents on the dates listed hereafter were conducted in a manner which was in violation of the Consent Decree dated March 15, 1973:

| | |
|---|---|
| March 19, 1973 | Monroeville, Pennsylvania |
| March 23, 1973 | Harrisburg, Pennsylvania |
| March 26, 1973 | Harrisburg, Pennsylvania |
| March 29, 1973 | Harrisburg, Pennsylvania |
| April 2, 1973 | Harrisburg, Pennsylvania |
| April 5, 1973 | Harrisburg, Pennsylvania |
| April 5, 1973 | Mechanicsburg, Pennsylvania |

| April 12, 1973 | Harrisburg, Pennsylvania |
| April 16, 1973 | Harrisburg, Pennsylvania |
| April 16, 1973 | Mechanicsburg, Pennsylvania |
| April 18, 1973 | Monroeville, Pennsylvania |
| April 19, 1973 | Harrisburg, Pennsylvania |
| April 23, 1973 | Harrisburg, Pennsylvania |
| April 30, 1973 | Harrisburg, Pennsylvania |
| May 5, 1973 | Harrisburg, Pennsylvania |
| May 14, 1973 | Mechanicsburg, Pennsylvania |
| May 14, 1973 | Harrisburg, Pennsylvania |

Petition Filed July 19, 1973

D(1)    The conclusions A(1) through A(6) set forth above are applicable.

D(2)    The meetings held by the Tollesons and their agents on July 7 and 8, 1973 at the Sheraton Motor Inn in Gettysburg, Pennsylvania were conducted in a manner which was in violation of the Consent Decree dated March 15, 1973.

D(3)    The conduct of said meetings held July 7 and 8, 1973 was in violation of the Special Injunction issued and filed February 23, 1973 and the Consent Decree dated March 15, 1973.

D(4)    The sales program described in Finding of Fact D(3) is a referral sales program which violates the Act and the Consent Decree filed by this Court March 15, 1973.

D(5)    The sales and attempted sales of executive memberships to nonresidents of the Commonwealth were in violation of the Special Injunction dated February 23, 1973 and the Consent Decree dated March 15, 1973.

SUMMARY

The conclusion of this Court is that the Tollesons acting individually or through their agents violated the provisions of both the Special Injunction issued and

filed February 23, 1973 and the Consent Decree issued and filed March 15, 1973. Once again, we remind the reader that the Consent Decree was proffered to this Court by both the Tollesons and the Commonwealth. Therefore there cannot be any misunderstanding on the part of the Tollesons concerning the meaning of the Consent Decree.

The record clearly shows that the meetings held subsequent to March 15, 1973 were in violation of the preliminary injunction. The record also shows that the frequency of the meetings increased after the preliminary injunction of March 15, 1973. Although the Tollesons admittedly made some additional disclosures at the meetings held subsequent to March 15, 1973, it is the observation of the Court that the Tollesons intentionally attempted to evade their responsibility under an injunction partially of their making by couching these disclosures in ambiguous terms.

The Tollesons contend that Exciting Life executive members and membership recruiters were in fact independent businessmen with only a casual relationship to the Tollesons and their companies. Although the record made in this case permits us to conclude that the Tollesons attempted to isolate themselves from the operations of Exciting Life by referring to executive members as independent businessmen, the record also clearly shows that these so-called independent businessmen were in fact agents of the Tollesons. Despite the Tollesons' claim of lack of knowledge or lack of control over what the Tollesons claimed were independent businessmen, the fact remains that at all of the meetings involved in this case, all of the formats or scripts were prescribed by the Tolleson organization. The meetings followed the prepared script down to the most minute detail, including directions on when to applaud, when to pause for emphasis, when to tell a joke, what jokes to tell and what to write on the blackboard. The prepared script for Get-Acquainted Meetings ends with the

admonition, "Don't add anything." It is our observation that all of the gimmicks at the meetings were designed intentionally to cause confusion and misunderstandings on the part of prospects. Such sales tactics are prohibited under the Act.

The Tollesons characterize themselves as uneducated farm boys, who are merely trying to lawfully take advantage of the growing industry of franchise selling. That characterization disolves upon a reading of the record made in this case. The record shows that the Tollesons might much more aptly be characterized as carnival pitchmen, attempting to take advantage of gullible citizens.

We have concluded that the Tollesons violated both the Special Injunction and the Consent Decree and, therefore, in the following order we will levy civil penalties. Section 8 of the Act, 73 P.S. §201-8 provides: "Any person who violates the terms of an injunction issued under section 4 of this act shall forfeit and pay to the Commonwealth a civil penalty of not more than five thousand dollars ($5,000) for each violation. For the purposes of this section the court of common pleas [Commonwealth Court] issuing an injunction shall retain jurisdiction, and the cause shall be continued; and, in such cases, the Attorney General, acting in the name of the Commonwealth of Pennsylvania, may petition for recovery of civil penalties." It is conceivable that each improper act, each false statement and each improper and inadequate disclosure to a prospect constituted a separate violation of these injunctions. However, exercising our judicial discretion, we will levy a single civil penalty for each of the meetings mentioned in the conclusions of law (a total of 23 meetings), even though many separate violations may have occurred at each meeting. We will also levy a single civil penalty for all mailings of promotional material in violation of the injunctions. Thus we will levy a total of 24 separate civil penalties.

As we have noted in the injunction proceeding opinion, this Court does not have power to order restitution. That will remain a course of action to be contemplated or taken by each of the individuals who paid money into the Tolleson organizations.

In light of the above, we therefore

### ORDER

AND Now, this 19th day of June, 1974, after hearing and argument, and based upon the above findings, conclusions and holdings, and under the authority of Section 8 of the Act of December 17, 1968, P. L. 1224, 73 P.S. §201-8, James Tolleson and Rodney Tolleson (also known as James E. Tolleson and Rodney W. Tolleson) jointly and severally, be and thereby hereby are directed and ordered to forfeit and pay over to the Commonwealth of Pennsylvania civil penalties in the total amount of $120,000.00 for the following violations of the injunctions of this Court, dated February 23, 1973 and March 15, 1973, for each of which specific violations listed below is set forth the specific civil penalty:

1. For each meeting conducted in violation of said injunctions:

| DATE | PLACE IN PENNSYLVANIA | APPLICABLE CIVIL PENALTY |
| --- | --- | --- |
| February 26, 1973 | Wilkes-Barre | $5,000.00 |
| March 15, 1973 | Reading | $5,000.00 |
| March 16, 1973 | Monroeville | 5,000.00 |
| March 16, 1973 | York | 5,000.00 |
| March 19, 1973 | Monroeville | 5,000.00 |
| March 23, 1973 | Harrisburg | 5,000.00 |
| March 26, 1973 | Harrisburg | 5,000.00 |
| March 29, 1973 | Harrisburg | 5,000.00 |
| April 2, 1973 | Harrisburg | 5,000.00 |
| April 5, 1973 | Harrisburg | 5,000.00 |
| April 5, 1973 | Mechanicsburg | 5,000.00 |
| April 12, 1973 | Harrisburg | 5,000.00 |

| April 16, 1973 | Harrisburg | 5,000.00 |
| April 16, 1973 | Mechanicsburg | 5,000.00 |
| April 18, 1973 | Monroeville | 5,000.00 |
| April 19, 1973 | Harrisburg | 5,000.00 |
| April 23, 1973 | Harrisburg | 5,000.00 |
| April 30, 1973 | Harrisburg | 5,000.00 |
| May 5, 1973 | Harrisburg | 5,000.00 |
| May 14, 1973 | Mechanicsburg | 5,000.00 |
| May 14, 1973 | Harrisburg | 5,000.00 |
| July 7, 1973 | Gettysburg | 5,000.00 |
| July 8, 1973 | Gettysburg | 5,000.00 |

2. For all mailings of promotional material in violation of said injunctions: 5,000.00

It is further ordered that judgment be entered in favor of the Commonwealth of Pennsylvania and against James Tolleson and Rodney Tolleson jointly and severally in the total amount of the above civil penalties and that the above-noted civil penalties shall be paid to the Commonwealth of Pennsylvania through the Prothonotary of the Commonwealth Court of Pennsylvania within 60 days from the date hereof. Costs to be paid by James Tolleson and Rodney Tolleson, jointly and severally. This Order shall become final if exceptions are not filed within 20 days from the date hereof.