STATE of Colorado, ex rel. Duane WOODARD, Attorney General of the State of Colorado, Plaintiff–Appellant,

v.

MAY DEPARTMENT STORES COMPANY, a New York corporation, d/b/a May D & F, Defendant–Appellee.

No. 90CA1795.

Colorado Court of Appeals,
Div. IV.

June 18, 1992.

As Modified on Denial of Rehearing
Oct. 15, 1992.

Certiorari Granted April 12, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., and James R. Lewis, Asst. Atty. Gen., Denver, for plaintiff-appellant.

Williams, Youle & Koenigs, P.C., Robert E. Youle, Karen DuWaldt, Denver, and Ronald J. Dolan and Stephen J. Horace, St. Louis, MO, for defendant-appellee.

Collier, Shannon & Scott, William C. Macleod, Washington, DC, amicus curiae for defendant-appellee.

Graft, Thomson and Toedte, P.C., Alexander L. Thomson, Englewood, amicus curiae for defendant-appellee.

Opinion by Judge DUBOFSKY.

Plaintiff, the State of Colorado, appeals the injunctive and monetary judgment entered by the trial court in an action brought under the Colorado Consumer Protection Act (CCPA) against defendant, May D & F. We reverse the trial court's injunctive order and remand with directions to enter a new injunction consistent with the views expressed in this opinion. As to the monetary judgment, we also remand for further findings and determination.

In June 1989, the State sued May D & F alleging that May D & F's price comparison advertising violated the CCPA. The State complained that the advertising approach taken by May D & F violated § 6–1–105(1)($l$), C.R.S. (1991 Cum.Supp.) (making false statements concerning the price of

goods); § 6–1–105(1)(i), C.R.S. (1991 Cum. Supp.) (advertising goods with the intent not to sell them as advertised); and § 6–1–105(1)(u), C.R.S. (1991 Cum.Supp.) (failing to disclose material information concerning the goods).

The matter was set for trial, and at that trial, evidence was presented showing that, between June 1986 and August 1989, May D & F set retail prices for its goods in the Home Store in the following manner (the 1986 policy). The prices in the Home Store, that part of May D & F which sold housewares, cookware, mattresses, linens, textiles, electronics, and small appliances, were set by its buyers who, when they ordered the merchandise, established two prospective prices.

The first price was called the initial markup (IMU) price. The buyer determined the IMU by using a formula that considered the cost of goods to May D & F and the cost of doing business and May D & F's profit goals. The IMU was the approximate price at which May D & F would sell its goods a majority of the time and a price which also would provide a reasonable profit.

When the buyers set the IMU price, they also set a promotional markup (PMU) price. The PMU price is substantially higher than the IMU price. The PMU price became May D & F's *original* or *reference* price to be used in its comparative price advertising. The buyers did not set the "PMU" or original price at a level at which "substantial sales" of the merchandise were expected.

The 1986 policy required the merchandise in the Home Store to be offered at the PMU price for at least 10 days at the beginning of each six-month selling period. After the 10 days, the sales price was reduced significantly (first reduction). The first reduction price usually approximated the IMU price. After the first reduction, customers were informed through in-store displays and newspaper and other media advertisements that the IMU was a substantially reduced price from the "original price."

During each six-month selling period, after the short term sales were completed, the price would return to the IMU price, but not to the PMU price. Thus, during the six-month selling period, merchandise in the Home Store was usually offered at a variety of new prices and advertising usually indicated that they represented substantial discounts from the PMU. After each six-month period ended, May D & F would reestablish the "original price" of the merchandise by again offering it at the initial PMU price for 10 days.

Evidence at trial demonstrated numerous examples of how the PMU and IMU pricing method worked. For example, there was trial testimony that a mattress cost May D & F $190. The buyer set the IMU price at $360 at which price May D & F's profit goal would have been substantially achieved. The buyer also set the PMU price for the mattress at $700. The mattress was listed for sale for 10 days at the $700 PMU price. After the 10–day PMU period elapsed, however, the price of the mattress was reduced to the IMU price, and through advertising, the public was informed that this was a substantial price reduction.

By characterizing the mattress as being on sale for a dramatically reduced price, May D & F induced customers to purchase it in the belief they had received a substantial price reduction. Actually the $360 IMU price was merely competitive with the prices for the same mattress at other area stores.

May D & F's 1986 policy assumed that virtually none of its goods would sell at the PMU price, and that indeed was the case. The PMU price was, thus, a fictitious or false price set only to create the illusion to members of the consuming public that they could receive a dramatic bargain. This pricing scheme was used for many years by May D & F and resulted in the sale of millions of dollars worth of products.

In August 1989, after the State filed this action, May D & F modified its comparative price advertising practices (the 1989 policy). The 1989 policy differed from the 1986 policy in two significant ways. First, the

initial PMU was reduced. Internally, this new reference price was called the regular price rather than the original price. Second, the PMU or original price under the 1989 policy was required to be in effect for at least 28 of the 90 days the item was offered for sale.

Because the reference price/PMU was in effect for almost one-third of the time that the merchandise was being sold, the evidence indicated that May D & F set that price at a lower markup so that there would be more sales during this initial period. This policy of requiring that the PMU be kept for 28 of the 90 days was based on the minimum offering period required by Connecticut and Wisconsin regulations addressing this problem.

After an eight-day bench trial in May 1990, the trial court found that May D & F's comparative advertising pricing policies violated the three above-referenced CCPA provisions. The trial court found that the May D & F buyers who set the PMU knew that the items would not sell at that inflated "original price." It also found that the advertised reduced bargain from the PMU to the sales price was a false claim. It concluded that the IMU price was the real "regular price" of the product, and the PMU price was not.

The trial court ordered May D & F to pay a civil penalty of $2,000 for each of the four customers who testified at trial and also to pay the State's attorney fees. It also enjoined May D & F's use of a PMU or reference price in advertising unless it was accompanied by disclosure of May D & F's methods of determining that inflated PMU price. On the basis that the injunctive relief and penalties imposed were inadequate, the State initiated this appeal.

## I.

### A.

■ Here, the trial court's injunction precluded May D & F from:

(1) using a promotional markup as a reference price unless it fully and completely discloses to consumers its method of determining the promotional markup;

(2) using reference price terms with meanings unique to May D & F unless it provides a glossary in its advertising which defines the reference term; and

(3) using a sale of limited duration to create a sense of urgency unless May D & F also discloses that the sale is only one of several such sales planned during the selling period.

The State argues that the provisions of this injunction are inadequate to assure protection for consumers. It argues that the injunction erroneously permits May D & F to continue employing fictitious reference pricing so long as it discloses its method of determining its various prices. The State contends that May D & F's manner of determining the reference price and its use in the comparative pricing scheme are inherently deceptive, and thus, its use of a fictitious reference price system should be unconditionally banned. It further maintains that the court's required disclosure statements are not adequate and that such disclosure statements cannot adequately eliminate the deceptive practice.

May D & F argues that the injunctive order of the trial court was within its discretion and that the disclosure requirements, coupled with the injunctive relief, adequately protect consumers so that they are no longer misled by the comparative price advertising. We agree with the State.

■ The granting or denial of an injunction, as well as its terms, lies within the sound discretion of the trial court and will be reversed only if there is an abuse of that discretion. *See Colorado Springs Board of Realtors, Inc. v. State,* 780 P.2d 494 (Colo.1989); *Litinsky v. Querard,* 683 P.2d 816 (Colo.App.1984).

■ While a trial court has broad discretion to fashion the appropriate injunctive relief, if there have been numerous, long-range, and repeated violations of law, the court has a duty to ensure that the injunctive decree will effectively redress the proven violations and prevent further ones. *See United States v. E.I. Du Pont de Nem-*

ours & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961).

■ Injunctions and disclosure statements are accepted vehicles to prevent deceptive advertising. *See Encyclopaedia Britannica, Inc. v. F.T.C.*, 605 F.2d 964 (7th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *Grolier, Inc. v. F.T.C.*, 699 F.2d 983 (9th Cir. 1983), *cert. denied*, 464 U.S. 891, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983); *In re Thompson Medical Co.*, 104 F.T.C. 648 (1984).

■ But, an injunction should be adequate to prevent the continuation of the retailer's violation of the law. *See United States v. E.I. Du Pont de Nemours & Co., supra; Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Furthermore, when disclosure statements are ordered by the courts, their language should be prominent, clear, and understandable. *See Encyclopaedia Britannica, Inc. v. F.T.C., supra.*

While the injunction order here states that both the 1986 and 1989 comparative pricing approaches of May D & F violate the CCPA, it does not prohibit May D & F from either using its 1986 or 1989 sales approach. The trial court's order implicitly states that, as long as May D & F discloses how it goes about setting its prices, it is no longer violating the CCPA. In our view, that is error.

While, in some circumstances, disclosure statements are sufficient to correct fraudulent and misleading practices, in others, they are not. *See F.T.C. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C.Cir.1985). In many instances, a disclaimer cannot effectively eliminate advertising practices which are deceptive, fraudulent, and misleading. *See F.T.C. v. Brown & Williamson Tobacco Corp., supra.*

Thus, here, in addition to requiring, if needed, a properly drafted disclaimer, the trial court should have also enjoined the underlying fraudulent practices. *See Amrep v. F.T.C.*, 768 F.2d 1171 (10th Cir.1985), *cert. denied*, 475 U.S. 1034, 106 S.Ct. 1167, 89 L.Ed.2d 352 (1986); *Thompson Medical Co. v. F.T.C.*, 791 F.2d 189 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *Encyclopaedia Britannica, Inc. v. F.T.C., supra.*

Comparative price advertising, if honestly done, is not misleading, and thus, it does not necessarily violate the CCPA. Here, however, the trial court did not require May D & F to stop even the most egregious of its 1986 or 1989 practices. We therefore agree with the State that, in failing to enjoin these deceptive practices, the trial court erred.

■ In order to avoid violating the CCPA, May D & F must set the initial (PMU) reference price as a bona fide price at which it intends to sell a significant number of products. *See Spiegel, Inc. v. F.T.C.*, 411 F.2d 481 (7th Cir.1969). It cannot be set so high that it is a fictitious price which results in deceptive or misleading advertisements.

We reject the trial court's view that its ordered disclaimer would prevent advertisements from being fraudulent and misleading, irrespective of the PMU price. A glossary explanation of how May D & F set its prices will not be adequate to remedy the effect on the customers of the other parts of the ad. *See F.T.C. v. Brown & Williamson Tobacco Corp., supra.*

We also agree with the State's implicit argument that a disclosure statement should be prominent, clear, and readily understandable to the public. It is apparent that the trial court did not impose this obligation on May D & F, and there is evidence that unless disclaimers are properly done, they will either be disregarded or will confuse rather than inform the public. *See F.T.C. v. Brown & Williamson Tobacco Corp., supra.*

■ Thus, the trial court erred in not requiring the disclosure statement to be sufficiently prominent and understandable to the public. It also erred in not requiring that May D & F demonstrate to it the adequacy of both the content and location of the disclaimer. *See Brennan v. Monson*, 97 Colo. 448, 50 P.2d 534 (1935).

### B.

██ The State next argues that May D & F's use of the 28/90 day time period for keeping its goods at the PMU is inadequate and, thus, misleads the public when the term "sale" is later used. We disagree with this contention.

While there is evidence in the record which indicates that most customers believe that a discounted sales price means that the product has been offered at a regular or non-sales price for a majority of the time it has been displayed, the trial court acted within its discretion in implicitly approving certain aspects of the 28/90 day 1989 policy. In our view, however, the trial court erred in not making those aspects of the 28/90 day policy which it approved minimum requirements so long as May D & F continues its present comparative reference price advertising.

### C.

██ The State next argues that the trial court's injunctive order was erroneous because it did not prohibit the sale of goods offered at the IMU price unless substantial quantities were first sold at the PMU price. We disagree that a particular product can only be advertised for sale at a discounted price after a substantial number have been sold at the PMU price. Because it does not allow for the good faith efforts of May D & F to set a bona fide PMU price, this approach is too restrictive.

Despite May D & F's good faith efforts to set a bona fide competitive price, we recognize that there are valid reasons why a product might not sell at the PMU price. We conclude, however, that it is essential for the trial court to monitor May D & F's pricing scheme for a reasonable period of time to ensure that it has acted in good faith in implementing the court's ordered aspects of the comparative pricing scheme. If this monitoring indicates that only a few products are sold at the PMU price, this might suggest that May D & F has not satisfactorily implemented the terms of the injunction and would require further action.

In summary, in regard to the court's injunctive order, we conclude:

(1) the disclaimer approach is inadequate to remedy the fraudulent advertising scheme;

(2) May D & F must be enjoined from using deceptive procedures, including fictitious PMU prices, in selling its products in the Home Store;

(3) at a minimum, those aspects of the 28/90 day PMU May D & F policy which the court approved must be a part of the court's order;

(4) disclaimers must be prominent and understandable to the public, and the court should review the disclaimers to ensure that these requirements are met;

(5) for a reasonable period of time, the trial court should require May D & F to file periodic reports demonstrating it is in compliance with the injunction; and

(6) those aspects of the trial court's order which are not affected by this order remain in place, *i.e.*, disclaimer information pertaining to short term sales.

### II.

██ The State next argues that the trial court erred in its award of civil penalties. Specifically, the State argues that the trial court erred by requiring, implicitly, proof of actual damages or harm to a particular customer as a predicate for awarding a civil penalty. May D & F argues, on the other hand, that the CCPA requires proof of an injury, loss, or damage to a particular party from the fraudulent or misleading advertisement before a penalty can be assessed. However, since it is unclear how the trial court interpreted the civil penalties section of the CCPA, we remand to the trial court for further findings of fact and conclusions of law. *See* C.R.C.P. 52.

The trial court awarded civil penalties against May D & F of $8,000. The court awarded a $2,000 civil penalty for each of the four witnesses who testified that they were misled by May D & F's advertising. Two of the witnesses purchased items in apparent response to the advertisements. Because of the advertisements, the other

two witnesses expended time, effort, and possibly money in pursuing products but ultimately decided not to buy them from May D & F. However, we cannot determine from the trial court's judgment whether it concluded that this was the sole basis upon which damages may be awarded or whether it concluded that the State's evidence was not sufficient to establish any other violation of the Act.

Since the question of what constitutes a violation of the CCPA that mandates imposition of a civil penalty will reoccur on remand, we address it now.

Section 6–1–112(1), C.R.S. (1991 Cum. Supp.), states:

> Any person who violates or causes another to violate any provision of this article *shall* forfeit and pay to the general fund of this state a civil penalty of not more than two thousand dollars for each such violation. For purposes of this subsection (1), a violation of any provision shall constitute *a separate violation with respect to each consumer or transaction involved;* except that the maximum civil penalty shall not exceed one hundred thousand dollars for any related series of violations.... (emphasis added)

■ In our view, the CCPA does not require that an actual injury or loss to a customer occur before a civil penalty may be awarded. A civil penalty under § 6–1–112 is not the same as an award of damages to an injured party in a tortious fraud lawsuit in which the injured party may recover only damages actually incurred. *Zimmerman v. Loose,* 162 Colo. 80, 425 P.2d 803 (1967).

Instead, the civil penalty award goes to the State's general fund, and thus, its purpose is not to make an injured party whole, but rather it is solely intended to punish the wrongdoer for its illegal acts.

Given this purpose, the State argues that a violation of the CCPA occurred every time a newspaper which contained a misleading and fraudulent comparative pricing advertisement was printed and distributed. Thus, if, for example, on a given day 500,000 newspapers were circulated with a misleading comparative pricing advertisement,

in the State's view, there would be 500,000 violations for which May D & F could be fined up to $2,000 per violation. These numbers would, of course, be multiplied by the number of days that the newspapers were printed and distributed. We reject this interpretation of the statute.

The first sentence in § 6–1–112(1) states that any person who violates any underlying provision of this article shall pay to the general fund a civil penalty for each violation. The next sentence in § 6–1–112(1) states that a violation of any provision constitutes a separate violation with respect to each customer or transaction involved. The issue then becomes how does the second sentence of § 6–1–112(1) impact the initial sentence of this statute.

■ A statute should be construed as a whole so as to give consistent, harmonious, and sensible effect to all its parts. *Seibel v. Colorado Real Estate Commission,* 34 Colo.App. 415, 530 P.2d 1290 (1974). The particular wording of a statute is presumed to have a purpose and, therefore, not to be repetitious of other wording in the statute. *State v. Borquez,* 751 P.2d 639 (Colo.1988); *People v. Bartsch,* 37 Colo.App. 52, 543 P.2d 1273 (1975). Applying these rules of construction, we conclude that the phrase "consumer or transaction involved," as used in § 6–1–112(1), refers to two different types of violation.

■ In our view, the term "each consumer ... involved" means a person who has been exposed to May D & F's misleading information and then either purchases the item or undertakes other activities in response to the information. Hence, a person who receives a copy of a newspaper with a misleading ad, but who does not read or respond to the ad in any way, would not be a consumer who is involved within the meaning of § 6–1–112(1).

With reference to the term transaction, we note that *Black's Law Dictionary* 1341 (5th ed. 1979) states that to transact means:

> to prosecute negotiations; to carry on business; to have dealings; to carry through; bring about; perform; to carry

on or conduct; to pass back and forth as in negotiations or trade; to bring into actuality or existence.

Other courts, which have interpreted deceptive practice acts like the CCPA, have determined that there is a violation of the act for which a penalty may be assessed each time a deceptive ad or information is displayed or broadcast. *See People v. Superior Court*, 96 Cal.App.3d 181, 157 Cal. Rptr. 628 (1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 787 (1980); *Commonwealth v. Tolleson*, 14 Pa. Cmwlth. 140, 321 A.2d 701 (1974); *State v. Ralph Williams N.W. Chrysler Plymouth*, 87 Wash.2d 298, 553 P.2d 423 (1976); *State v. Menard, Inc.*, 121 Wis.2d 199, 358 N.W.2d 813 (App.1984). These courts have determined that a penalty may be assessed for violating the act, irrespective of actual injury to a customer. *See People v. Superior Court, supra.*

Some courts have either found or acknowledged that there is a conceivable basis to find that each time a misleading deceptive ad is displayed or broadcast, a transaction is involved and a penalty is required. *See People v. Superior Court, supra; United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955 (3rd Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982). However, other courts, in interpreting their deceptive practice acts, have taken a more narrow view of what constitutes a separate violation and have held that there is only one violation for each day an advertisement by a particular media entity is used. *State v. Ralph Williams N.W. Chrysler Plymouth, supra; State v. Menard, Inc., supra; Commonwealth of Pennsylvania v. Tolleson, supra.*

 Under the circumstances here, we adopt the more narrow concept, and we hold that a transaction under the CCPA consists of one ad in one media outlet per day. In other words, if, on a given day, there are 500,000 newspapers with deceptive May D & F advertisements displayed in them, there would only be one violation on that day rather than 500,000. On the other hand, if the ad is run in two newspapers or in one newspaper and on one television station, two violations would occur.

Thus, we conclude that § 6–1–112(1) requires a civil penalty for each consumer affected by the misleading advertisement or broadcast, as well as for each transaction involved.

The State argues, *inter alia*, that it proved numerous transactions in regard to the regular use of media as well as establishing more than 16,000 transactional sales to customers. If the trial court did not initially evaluate the State claims in terms of the above-stated standards, it must do so on remand.

If, on remand, the court determines that there were numerous additional violations, it need not, of course, impose a maximum award of $2,000 for each violation. Furthermore, if the trial court determines that it did not apply correct legal standards in assessing the evidence presented by the State and decides to make an additional civil penalty award, it should apply the following concepts in determining the amount of that award:

(a) the good or bad faith of the defendant;

(b) the injury to the public;

(c) the defendant's ability to pay; and

(d) the desire to eliminate the benefits derived by violations of the CCPA.

*See United States v. Papercraft Corp.*, 540 F.2d 131 (3rd Cir.1976); *Commonwealth v. Fall River Motor Sales, Inc.*, 409 Mass. 302, 565 N.E.2d 1205 (1991).

## III.

 Section 6–1–106(1)(a), C.R.S., states that the CCPA does not apply to a party if its conduct *complies* with the orders or rules or a statute administered by a federal, state, or local government agency. The trial court determined that a Federal Trade Commission guideline addressing proper comparative pricing was an order or part of a statute administered by a federal agency. It further found, however, that May D & F was not in conformity with the order or statute and that, therefore, it was not exempt from the CCPA.

The State argues that the trial court erred in determining that the guideline was part of an order or statute within the mean-

ing of § 6–1–106(1)(a). May D & F argues that the F.T.C. guideline is a part of the Federal Trade Commission's enabling and governing statutes, but argues that, since the trial court found it was not in compliance with this statute, the issue is irrelevant and moot. Furthermore, on appeal, May D & F has not argued that it is exempt from the CCPA.

We agree with May D & F that, since its conduct was not in compliance with the applicable F.T.C. guidelines, it is not exempt from the CCPA and the trial court's ruling concerning the F.T.C. guideline as being an order or part of a statute is irrelevant and moot. *See Coon v. Berger,* 41 Colo.App. 358, 588 P.2d 386 (1978), *aff'd,* 199 Colo. 133, 606 P.2d 68 (1980). We therefore do not decide whether May D & F would be exempt from the CCPA if it had complied with the guidelines.

IV.

■ The State finally argues that the trial court erred in considering as mitigating factors May D & F's adoption of its 1989 policy, its Satisfaction Guaranteed policy which offered a full refund to dissatisfied customers, and its hiring of a Consumer Affairs Director. We agree with the State that insofar as May D & F's 1989 policy is illegal, it is not a mitigating factor, but we agree with May D & F that the other matters are mitigating factors.

While the trial court considered the 1989 policy an improvement on the 1986 policy, it still found it illegal in certain aspects. Insofar as the 1989 policy is illegal, the illegal aspects are not proper items to be considered in mitigation.

■ We agree, however, with the trial court that the Satisfaction Guaranteed policy, which provides a refund to a dissatisfied customer for any reason, and the hiring of the Consumer Affairs Director to monitor compliance with May D & F's advertising standards are matters within its discretion and could properly be considered as mitigating factors in assessing damages. *See Industrial Commission v. Ewing,* 160 Colo. 503, 418 P.2d 296 (1966); *Comfort Homes, Inc. v. Peterson,* 37 Colo.App. 516, 549 P.2d 1087 (1976).

The other arguments of the State are without merit.

In summary:

(1) the trial court's injunction is reversed, and the cause is remanded for it to enter a new injunction consistent with this opinion;

(2) the civil penalty determination is remanded for further consideration in light of the views expressed herein;

(3) because the trial court properly considered the F.T.C. guidelines irrelevant to its decision in this case, we do not decide whether, if May D & F had conformed to the guidelines, it would be exempt from the CCPA;

(4) the illegal aspects of the 1989 policy of May D & F are not mitigating factors. However, its refund policy and appointment of a Consumer Affairs Director are legitimate mitigating factors.

CRISWELL and MARQUEZ, JJ., concur.