The **MAY DEPARTMENT STORES COM-PANY, a New York corporation, d/b/a May D & F, Petitioner,**

v.

The **STATE of Colorado ex rel. Duane WOODARD, Attorney General of the State of Colorado, Respondent.**

**No. 92SC749.**

Supreme Court of Colorado,
En Banc.

Nov. 15, 1993.

Rehearing Denied Dec. 6, 1993.

---

Williams, Youle & Koenigs, P.C., Robert E. Youle, Karen DuWaldt, Denver, Ronald J. Dolan, Stephen J. Horace, St. Louis, MO, for petitioner.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Garth C. Lucero, Deputy Atty. Gen., Jan Michael Zavislan, First Asst. Atty. Gen., Diana R. Maurer, Jack M. Wesoky, James R. Lewis, Asst. Attys. Gen., for respondent.

William C. MacLeod, Washington, DC, Graft, Thompson and Toedte, P.C., Alexander L. Thomson, Englewood, for amicus curiae Colorado Retail Council.

Justice ERICKSON delivered the Opinion of the Court.

The State of Colorado brought this action pursuant to the Colorado Consumer Protection Act to recover damages and to enjoin the May Department Stores Company, a New York corporation, d/b/a May D & F (May D & F). Following an eight-day trial to the court, the district court found May D & F's price comparison advertising violated the Colorado Consumer Protection Act (CCPA), sections 6–1–101 to –115, 2 C.R.S. (1992 & 1993 Supp.). The district court enjoined May D & F from using a promotional mark-up price as a reference price in its advertising in a department of May D & F called the "Home Store" without also disclosing May D & F's methods of determining the inflated promotional mark-up price.[1] The district court also ordered May D & F to pay a civil penalty of $2,000 to the State for each of the four consumers who testified at trial regarding May D & F's deceptive practices.

The court of appeals reversed and remanded the case to the district court with directions to enter a different injunction and for further findings with respect to the monetary judgment in *State ex rel. Woodard v. May Department Stores Co.*, 849 P.2d 802 (Colo.App.1992). May D·& F ap-

---

1. The "Home Store" is a department of May D & F that sells housewares, cookery, mattresses, linens, textiles, electronics, and small appliances.

pealed and we granted certiorari to review the court of appeals interpretation of the CCPA and its holdings concerning the trial court's injunction. We affirm the court of appeals interpretation of the CCPA and its remand to the trial court for further consideration of the injunctive relief, but reverse the court of appeals order for different injunctive relief. We return this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

I

May D & F has operated department stores in Colorado for a number of years.[2] Between 1986 and August 1989, May D & F set its retail prices using "Comparative Price Advertising" policies (1986 policy). In comparative-price advertising, a retailer compares its current selling price with a higher price in order to demonstrate savings or bargains to the consumer. The higher price, often referred to as the reference price, may be a former in-store price, a competitor's price, or a manufacturer's suggested retail price. Types of comparative price advertisements include percentage-off claims, dollars-off claims, and explicit price comparisons.[3] The comparative price advertisements in this case involve comparisons between current and former in-store prices established by May D & F.

The 1986 policy required May D & F to set two prices for an item sold in the Home Store. The first price was called the initial mark-up (IMU) price. The IMU price was May D & F's usual mark-up over its cost. May D & F determined the IMU price by using a formula that took into account the cost of goods to May D & F, May D & F's business expenses, and May D & F's profit goals. May D & F expected to sell most of the goods at the IMU price. The second price set by May D & F was the promotional mark-up (PMU) price which was substantially higher than the IMU price. Although May D & F represented the PMU price to customers as the "regular" or "original" price, May D & F did not expect to make significant sales at the inflated PMU price.

May D & F utilized a six-month selling period to sell merchandise. The PMU price was offered for approximately ten days out of every six-month selling season. After ten days, May D & F reduced the PMU price, represented to the public as the "original" selling price, to the IMU price, represented to the public as the "sale" price. May D & F informed its customers through in-store displays and other media advertisements that the "sale" price was a substantial reduction from the "original" or PMU price. During the selling period, the merchandise would also be sold at a variety of "sale" prices which discounted the price from the IMU price for a short period of time. When these sales were completed, the price would return to the IMU price. After the six-month selling period ended, May D & F offered the merchandise at the PMU price again for ten days.

In August, 1989, May D & F orally modified its 1986 pricing policy (the 1989 policy).[4] The 1989 policy altered the 1986 policy in two significant ways. First, the PMU reference prices were reduced and were identified internally as "regular" prices rather than "original" prices. Second, the PMU reference price was in effect for at least twenty-eight out of each ninety-day selling period.[5] Because the PMU reference price was in effect for nearly one third of a selling period, the 1989 reference price was set at a price lower than the 1986

---

**2.** As of May 2, 1993, the May Department Stores Company combined its Foley's and May D & F's divisions and began operating the May D & F stores as Foley's.

**3.** An example of an explicit price comparison is "regularly $599, on sale for $399."

**4.** Note that the action was brought by the State against May D & F in June, 1989. It is possible the policy was altered as a result of the pending litigation.

**5.** May D & F based the twenty-eight out of ninety-day standard on the minimum offering periods required under Connecticut and Wisconsin law. *See* Conn.Agencies Regs. §§ 42–110b–10a(1), 42–110b–12a(b)(2) (1986); Wis.Admin.Code §§ Ag 124.03(1), 124.05(1)(b) (July 1981).

reference price to induce more sales during the initial sales period.

After a trial to the court, the court found that May D & F's price comparison advertising violated three sections of the CCPA. §§ 6–1–105(1)(i) (advertising goods with the intent not to sell them as advertised), 6–1–105(1)(*l*) (making false statements concerning the price of goods or amounts of price reductions), and 6–1–105(1)(u), 2 C.R.S. (1992) (failing to disclose material information concerning the goods). The district court reasoned:

> May D & F's "original" price for practically all of its merchandise in the Home Store was a fictitious high price established as a reference price for the purpose of subsequently advertising bargain reductions from that price. The clear expectation of May D & F was to sell all or practically all merchandise at its "sale" price. May D & F's "regular" price, pursuant to the 1989 policy was certainly a step in the right direction, but May D & F's failure to disclose to the public its subjective and unique method of setting its "regular" price for reference purposes, and, its unique schedule or calendar for establishing when those "regular" prices are in effect, have been shown at trial to effect (sic) consumers' choices and conduct concerning merchandise to their detriment.

The trial court determined May D & F knew the merchandise would not sell at the PMU or "original" price, the advertised reduced price was a false claim, and the IMU price was the true "regular" price of the merchandise.

To remedy May D & F's violation of the CCPA, the trial court enjoined the following acts: (1) May D & F's use of the PMU as a reference price without disclosure of the method by which May D & F determined the PMU price; (2) May D & F's use of unique advertising terminology without disclosure of May D & F's definition of the advertising terms; and (3) May D & F's use of sales periods of limited duration to convey a false sense of urgency to purchase. The district court also ordered May D & F to pay the State civil penalties in the amount of $2,000 for each of the four consumers who testified at trial as victims of May D & F's deceptive practices and to pay the State's attorney fees.

The court of appeals held that the district court's injunctive order would not prevent May D & F from engaging in even the most egregious deceptive practices under the 1986 and 1989 policies and mandated its own injunctive relief.[6] *May Dep't Stores Co.*, 849 P.2d at 808. The court held that the CCPA requires imposition of penalties both for consumers who responded to a misleading advertisement *and* for each day a deceptive advertisement appeared in a particular media outlet. The court of appeals reversed the trial court's injunctive order and remanded the case with directions to enter a new injunction consistent with the views expressed in the court of appeals opinion. The court of appeals also remanded the case for further findings and determination with respect to the civil penalties under section 6–1–112, 2 C.R.S. (1992). Because it was unclear how the trial court calculated its civil penalties, the court of appeals directed the trial court, on remand, to calculate civil penalties based on the number of false advertisements published by May D & F measured as one advertisement in one media outlet per day and based on each consumer who undertook some activity in response to the false advertisements. The court of appeals further directed the trial court to consider various factors, both mitigating and aggravating, in assessing the amount of civil penalties.

We affirm the court of appeals interpretation of the CCPA, reverse the court of appeals order for injunctive relief and return this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

## II

This appeal involves judicial interpretation of the CCPA's civil penalties provision,

---

6. *See infra* part III.

specifically, the language providing that a violation of the CCPA "shall constitute a separate violation with respect to each consumer or transaction involved."[7] § 6–1–112(1), 2 C.R.S. (1992). The court of appeals interpreted this language to mean a violation occurred for each consumer involved and for each day a deceptive advertisement appeared in a particular media outlet. May D & F contends that the phrase "consumer or transaction involved" was misinterpreted by the court of appeals in two ways. First, May D & F contends that "transaction" does not mean each day of publication in a particular media outlet. Second, May D & F argues that construing the statute to provide a violation for each consumer *and* each transaction involved is an incorrect interpretation of the CCPA. We disagree.

■■■ The court must attempt to construe a statute to give its terms their plain and obvious meaning. *Watters v. Pelican Int'l, Inc.*, 706 F.Supp. 1452 (D.Colo.1989); *Goebel v. Colorado Dep't of Institutions*, 830 P.2d 1036 (Colo.1992). A statute must be interpreted in a manner consistent with the spirit and intent of the General Assembly in enacting the legislation. *People v. Schuett*, 833 P.2d 44 (Colo.1992). The court should make certain that the statute is construed in such a way as to avoid absurd or unintended results. *City of Ouray v. Olin*, 761 P.2d 784 (Colo.1988). Finally, the statute must not be construed in such a manner that would render a civil penalties provision ineffective in accomplishing the purpose for which it was enacted. *See People v. Gross*, 830 P.2d 933

---

7. Section 6–1–112, 2 C.R.S. (1992) provides:
   **6–1–112. Civil Penalties.** (1) Any person who violates or causes another to violate any provision of this article shall forfeit and pay to the general fund of this state a civil penalty of not more than two thousand dollars for each such violation. For purposes of this subsection (1), a violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved; except that the maximum civil penalty shall not exceed one hundred thousand dollars for any related series of violations.

8. The fact that the CCPA is intended to deter as well as to punish the misleading advertiser is evident from the history of the statute. The

---

(Colo.1992); *Dunlap v. Colorado Springs Cablevision, Inc.*, 829 P.2d 1286 (Colo. 1992).

### A

Section 112(1) of the CCPA contains the directive that a person who "violates" the act shall pay a civil penalty of up to $2,000 "for each violation." The mandatory nature of this penalty is consistent with the legislative spirit and intent to provide "prompt, economical, and readily available remedies against consumer fraud." *Western Food Plan, Inc. v. District Court*, 198 Colo. 251, 256, 598 P.2d 1038, 1041 (Colo. 1979). Civil penalties serve several important functions, one of which is as a deterrent against future unlawful practices. *True v. United States*, 894 F.2d 1197, 1205–06 (10th Cir.1990). Although the General Assembly did not address the purpose of the CCPA, the court of appeals recognized the deterrent function of the act when it held that the purpose of the civil damage award in this case is not to make an injured party whole, but to punish wrongdoers for illegal acts.[8] *May Dep't Stores Co.*, 849 P.2d at 809. The deterrent goal is also demonstrated by the fact the award of monetary damages in civil penalties is to the State and not to the harmed individual.

■■■ Because the CCPA's civil penalty requirement is intended to punish and deter the wrongdoer and not to compensate the injured party, the CCPA is intended to proscribe deceptive acts and not the consequences of those acts. In *People ex rel.*

---

CCPA originally was modeled after the so-called "*Printers' Ink* Model Statute" drafted in 1911 at the behest of the advertising journal of the same name. *See* Note, *The Regulation of Advertising*, 56 Colum.L.Rev. 1018, 1098 (1956). The *Printers' Ink* model made it a misdemeanor to place before the public any advertisement containing any assertion which is untrue, misleading, or deceptive. *Id.* at 1058 n. 245. Advertisers who violated the statute were strictly liable for the assertions because proof of intent to deceive or knowledge of the improper character of the advertisement was not required. The intent element was left out because of the difficulty of proving subjective knowledge. *Id.* at 1059.

*Dunbar v. Gym of America, Inc.*, 177 Colo. 97, 113, 493 P.2d 660, 668 (1972), the court stated:

> [I]t is in the public interest to invoke the state's police power to prevent the use of *methods* that have a *tendency or capacity* to attract customers through deceptive trade practices.... The Colorado Consumer Protection Act is an outgrowth of this conclusion....

(Emphasis added.) Therefore, as the court of appeals pointed out, the CCPA does not require proof of an actual injury or loss before a civil penalty can be awarded.[9] *May Dep't Stores Co.*, 849 P.2d at 802. In order to effectuate the broad remedial relief and deterrence purposes, the CCPA does not require proof of actual injury.[10] *See Duran v. Clover Club Foods Co.*, 616 F.Supp. 790, 793 (D.Colo.1985) (claiming Colorado courts interpret the CCPA as intended to protect consumers against fraud); *Western Food Plan, Inc.*, 198 Colo. at 256, 598 P.2d at 1041 (stating "the broad legislative purpose [is] to provide prompt, economical, and readily available remedies against consumer fraud"); *People ex rel. MacFarlane v. Alpert Corp.*, 660 P.2d 1295, 1297 (Colo.App.1982) (noting the CCPA was enacted to control deceptive trade practices and that it is a broad protective statute).

**B**

■ The language of the statute must be analyzed in light of the purpose of the statute to.determine what constitutes a violation of the statute sufficient to warrant a civil penalty. The central phrase in the act is that a violation of any provision of the CCPA is a separate violation with respect to each "consumer or transaction involved." The statute contemplates two different types of violations: one in which a consumer is involved and one in which a transaction is involved.

■ The court of appeals defined each "consumer ... involved" to mean a person who has been exposed to May D & F's violations and either purchases merchandise subject to the misleading information

**9.** After utilizing the *Printers' Ink* model for many years, in 1969 the General Assembly adopted the CCPA which was based on the Uniform Deceptive Trade Practices Act (UDTPA). *See People ex rel. Dunbar v. Gym of America, Inc.*, 177 Colo. 97, 108–09, 493 P.2d 660, 665 (1972). One of the few sections the General Assembly did not adopt was § 3(a) of the UDTPA. This section includes a statement that proof of monetary damages, loss of profits or intent to injure is not required. 9A Uniform Laws Annotated, Uniform Deceptive Trade Practices Act § 3(a) (Supp.1967). The General Assembly's omission of UDTPA § 3(a) does not necessarily mean that the legislature intended to require proof of actual injury. Such a reading would defeat the intent of the statute as a broad remedial statute and ignore the legislative focus on the act of advertising rather than the injury to the consumer in the CCPA's definition of "advertisement." *See* § 6–1–102(1), 2 C.R.S. (1992). Additionally, there is no legislative history of the CCPA memorialized. *See* David B. Lee, Note, *The Colorado Consumer Protection Act: Panacea or Pandora's Box?*, 70 Denv. U.L.Rev. 141, 148 (1992). However, a Colorado Legislative Council Report published in 1966, indicates the Council's recommendation to have the law amended to prohibit false comparison advertising but does not suggest that the General Assembly alter the no actual injury requirement of the *Printers' Ink* model. Legislative Council Report to the Colorado General Assem-

bly, *Consumer Problems in Colorado*, Research Publication No. 112 (Nov. 1966).

If the CCPA required some consumer injury or involvement, the state would be forced to wait until consumers were victimized before it could seek complete relief. A policy of tolerating false advertising until a customer was actually injured would contradict the mandatory nature of the civil penalty required for each violation and would ignore the plain language and broad remedial purposes of the CCPA. According to one court: "A claimant need not prove consumer reliance to establish an unfair or deceptive practice. A claimant must prove that the conduct has the capacity or tendency to deceive." *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wash.2d 298, 553 P.2d 423, 436–37 (1976), *appeal dismissed*, 430 U.S. 952, 97 S.Ct. 1594, 51 L.Ed.2d 801 (1977) (citations omitted).

**10.** An expansive approach is taken in interpreting the CCPA by reading and considering the CCPA in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose. *State Highway Comm'n v. Haase*, 189 Colo. 69, 537 P.2d 300 (1975); *People ex rel. MacFarlane v. Alpert Corp.*, 660 P.2d 1295, 1297 (Colo.App.1982) (citing *Howe v. People*, 178 Colo. 248, 496 P.2d 1040 (1972)). *See also* § 2–4–201(1)(b), 1B C.R.S. (1980) (describing that the entire statute is intended to be interpreted to be effective).

or undertakes other activities in reliance on the advertisement. *May Dep't Stores Co.*, 849 P.2d at 809. We agree with this interpretation. Of the four witness who testified against May D & F alleging injury, two actually purchased items in response to the deceptive advertising, and two, although they did not actually purchase the items, expended time and effort considering the merchandise.

█ The more difficult question, however, is what constitutes a separate violation for each "transaction involved." The court of appeals defined transaction as "one ad in one media outlet per day." *Id.* at 810. As noted, *supra*, no actual injury to the customer is required in order for the court to determine if a penalty should be assessed for the violation. The best interpretation of "transaction involved" is that the transaction does not have to cause actual injury to the consumer to be a violation subject to civil penalty. The "consumer ... involved" almost necessarily involves an actual injury while the "transaction involved" concerns the dissemination of false or misleading information. In order to give effect to the intent of the statute, both violations must be interpreted as susceptible to the assessment of civil penalties. May D & F offers a different definition of "transaction involved"—that a "transaction" is merely an act altering a legal relationship, such as the sale between a buyer and seller. This definition does not give effect to the intent of the statute in that a transaction may include the dissemination of information and not just a sale between a buyer and seller.

Other courts that have interpreted similar consumer protection statutes have attempted to give meaning to provisions awarding civil penalties. None of these cases restrictively interpret "separate violation" to include only those advertisements that actually induced a consumer to buy. Although the relevant civil penalty statutes relied on by the courts do not explicitly attempt to define what constitutes a violation, (as does section 112(1) in

this case) each court defines separate violations in terms of the *dissemination* of false and misleading information rather than on actual injury after examining the purpose of the local consumer protection act.

*State v. Menard, Inc.*, 121 Wis.2d 199, 358 N.W.2d 813 (App.1984), involved the advertisement of kitchen cabinets in several area newspapers. The advertisements compared Menard's prices with the manufacturer list prices. The comparison was found to violate the Wisconsin price comparison advertising regulations.[11] The court held that a separate violation of Wisconsin's consumer protection act occurred each time an improper advertisement was published and that each newspaper edition constituted a separate publication. *Id.* 358 N.W.2d at 815. In so holding, the court rejected Menard's argument that each distinct advertisement should be considered one violation regardless of the number of publications in which the advertisement ran. The court stated:

> Treating each publication as a separate violation is reasonable because the audience size exposed to an improper price comparison is not intended to define a violation under ch. Ag 124. Section Ag 124.02(1) defines an advertisement as any "oral, written or graphic representation made in connection with the solicitation of business." This definition indicates an intention to protect the public from deceptive advertising regardless of the audience size.

*Id.* (citation omitted).

*People v. Superior Court*, 96 Cal.App.3d 181, 157 Cal.Rptr. 628 (1979), addressed advertisements for realty services on the radio and in newspapers. The advertisements falsely claimed that the realty company sold substantially more houses within a specified time than it actually sold. The trial court held the false claim violated California statutes dealing with false and misleading advertising and unfair competi-

---

11. The relevant Wisconsin statute on civil penalties reads: "The department of justice ... may ... recover a civil forfeiture to the state of not less than $100 nor more than $10,000 for each violation of an injunction." Wis.Stat. § 100.26(6) (West 1986).

tion.[12] In affirming the statutory violation, the court of appeals stated that the statute at issue created a separate violation for each publication in addition to violations for those who read the deceptive newspaper advertisement, purchased a product or service due to the deceptive advertisement, or made inquiries about the product or service as a result of the advertising. *Id.* 157 Cal.Rptr. at 639. In holding that, at a minimum, each publication constituted a separate violation, the court of appeals rejected the contention that each violation should be measured in terms of a newspaper's circulation. Assessing a penalty for each newspaper customer to whom the false advertisement is distributed would be a violation of the due process prohibition against oppressive and unreasonable statutory penalties despite the mandatory statutory cap on the awards indicating that there is a reasonable middle-ground of interpretation of separate violation. *Id.* 157 Cal.Rptr. at 638–39.

*State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wash.2d 298, 553 P.2d 423 (1976), *appeal dismissed*, 430 U.S. 952 (1977), 97 S.Ct. 1594, 51 L.Ed.2d 801 involved deceptive and false newspaper and television advertisements. The advertisements falsely claimed that the defendant automobile dealership offered better credit terms than other dealerships, sold quality used cars at prices lower than the competition, and provided certain types of warranties. The trial court ruled that the dealership violated the Washington consumer protection act and assessed civil penalties.[13] The Supreme Court of Washington declined to follow a one-violation-per-consumer rule, defined a violation as conduct that had the capacity or tendency to deceive, rather than actual injury, and held that there was a violation for each of the

ten separate classifications of wrongs. *Id.* 553 P.2d at 436–37.

The definition of "advertisement" in the CCPA also supports the interpretation given to the term "transaction" by the court of appeals. "Advertisement," for purposes of the CCPA "includes the attempt by publication, dissemination, solicitation, or circulation, visual, oral, or written, to induce directly or indirectly any person to enter into any obligation or to acquire any title or interest in property." § 6–1–102(1), 2 C.R.S. (1992). The audience size has nothing to do with how "advertisement" is defined. The focus of the proscription is on the act of publishing, disseminating, or soliciting and not on how the consumer acts upon the misleading information. Assessing a civil penalty based on the dissemination of misleading information rather than on the receipt of the information or on a consumer acting on the information (which is already addressed in the statute) effectuates the purpose behind the statute.

The Colorado civil penalty statute was adopted to provide a mechanism to punish a wrongdoer, not as a mechanism to compensate an injured party. In order to effectuate the retributive goal, we adopt the court of appeals definition that "each ... transaction" means that section 112(1) creates a penalty for both consumers and transactions involved in the misleading or false advertisement. Assessing a penalty for a consumer involved punishes the advertiser for the injury sustained by the purchaser or potential purchaser. Assessing a penalty for a transaction involved, however, punishes the deceptive act. In this manner, substance is given to the CCPA's mandate to punish and deter the deceptive act and not just the injury. We therefore affirm the court of appeals holding the term transaction to mean "one ad in one media outlet

---

**12.** The relevant California statute on civil penalties states:

Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the state of California by the Attorney General....

Cal.Bus. & Prof.Code § 17536 (West 1987) (misleading advertising); Cal.Bus. & Prof.Code § 17206 (West 1987) (unfair competition).

**13.** The relevant Washington statute on civil penalties reads: "Every person who violates RCW 19.86.020 shall forfeit and pay a civil penalty of not more than two thousand dollars for each violation." Rev.Code of Wash. § 19.86.140 (1992).

per day." *May Dep't Stores Co.*, 849 P.2d at 810.

## C

The goal of a court in construing a statute is to ascertain and give effect to the intent of the General Assembly. In order to determine the legislative intent, courts look first to the statutory language. *Bloomer v. Boulder Board of Comm'rs*, 799 P.2d 942, 944 (Colo.1990). Each word in a statute has a meaning which is presumed to be consistent with the intent of the statute. *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991); *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1111 (Colo.1990).

This court has held that "[t]he legislature's use of the disjunctive 'or' demarcates different categories." *Bloomer*, 799 P.2d at 946. The word "or" also is used to create a multiple rather than an alternative obligation.[14] *Atchison v. City of Englewood*, 193 Colo. 367, 568 P.2d 13 (1977) (interpreting a contract).

In this case, in order to give effect to the intent of the General Assembly, the disjunctive "or" must be read as a multiple. The statute does not list mutually exclusive violations; it lists separate categories of violations, each of which may be assessed a penalty. In effect, the State is given multiple options, no one of which precludes the other.[15] Because the purpose is to deter and punish regardless of actual injury or intent, and the language refers to both actual injury to customers and the transactions involved, the intent of the General Assembly must have been to create a mechanism whereby both actual harm as well as the act of dissemination is punishable.

The result of reading the term "or" as a disjunctive rather than a multiple is that if the state wishes to seek penalties based on the customers involved, any serious deterrence would only be achieved by producing a large number of harmed customers as evidence. Otherwise, the minimal penalties become no more than just the cost of doing business.[16] Consumer injury is not a necessary element of a CCPA violation, nor is it an essential element to the award of civil penalties. Evidence of deceit—i.e., that false information was disseminated—would still be required. If the State, however, wished to seek penalties for the transactions involved, it would not be necessary to present to the court information concerning the injury to the customer.[17] Because actual injury is not required, the term "consumer ... involved" would be read out of the statute in this instance and the state would only seek damages for each "transaction involved." We will not assume that

---

14. The court of appeals has held "[i]n interpreting the meaning of 'and' or 'or' in statutes, regulations, and ordinances, the substitution of one for the other may be necessary." *Gamble v. Levitz Furniture Co.*, 759 P.2d 761, 764 (Colo. App.1988), *cert. denied*, 782 P.2d 1197 (Colo. 1989). Furthermore, this court will construe one conjunction as the other to give effect to the intent of a statute or to harmonize the statute with conflicting statutes. *Denver–Chicago Trucking Co. v. Republic Drug Co.*, 134 Colo. 461, 465, 306 P.2d 1076, 1078 (1957) (declaring "[i]t appears to be well established that courts will sometimes construe 'or' to mean 'and' in order to carry out the plain meaning or intent of the legislature"); *People v. McCoy*, 821 P.2d 873, 875 (Colo.App.1991) (stating "the term 'or' as used in a statute is presumed to be used in the disjunctive sense unless legislative intent is clearly contrary"); *Gamble*, 759 P.2d at 764 (stating that the term "and" or "or" should be interpreted to harmonize the statute with conflicting statutes).

15. The multiple nature of the term "or" can be seen by inverting the sentence structure: With respect to each customer or transaction involved, a violation of any provision shall constitute a separate violation.

16. As the court of appeals noted, the pricing scheme used by May D & F resulted in the sale of millions of dollars worth of merchandise.

17. If the statute were read as a disjunctive and the state selected only consumers who were actually injured, either the award would be minimal and the deterrence slight, or the proof offered by the state of actual injury to the consumers would be unduly burdensome to the courts. In the alternative, the state would never present evidence of consumers who were misled knowing that the court could not assess penalties for both. If evidence of consumer harm were not presented it would be more difficult for the trial court to fashion injunctive relief. *See infra* part III(B)(1).

the General Assembly wrote a term into a statute that had no meaning.[18] We do not believe that "consumer ... involved" and "transaction involved" are mutually exclusive.[19]

Because it is unclear how the trial court interpreted the CCPA and awarded civil penalties,[20] we return this case to the court of appeals with directions to remand to the trial court for further review of the civil penalty award consistent with this opinion.

### III

The court of appeals also remanded this case to the trial court to reconsider the injunctive relief awarded to the State and made several specific determinations as to what type of relief was warranted under the circumstances. The court of appeals found that the district court's order was insufficient because it did not enjoin the underlying fraudulent practices in May D

& F's 1986 and 1989 policies.[21] *May Dep't Stores Co.*, 849 P.2d at 807. Rather than remand the case for further proceedings and modification of the disclaimer requirement, the court of appeals entered a different injunction. The court of appeals found:

(1) the disclaimer approach is inadequate to remedy the fraudulent advertising scheme;

(2) May D & F must be enjoined from using deceptive procedures, including fictitious PMU prices, in selling its products in the Home Store;

(3) at a minimum, the 28/90 day PMU May D & F policy must be a part of the court's order;

(4) disclaimers must be prominent and understandable to the public, and the court should review the disclaimers to ensure that these requirements are met;

---

18. It is clear from an example that reading the term "or" as a multiple satisfies the purpose of the statute. For example, a mattress with the false advertised original price of $700 on "sale" for $350 can be advertised in both a newspaper and on the merchandise itself. One customer may enter the store and see the "sale" price without ever having received or read the newspaper advertisement. That customer may act on that advertisement. Another customer may see the same advertisement printed in the newspaper. If the term "or" is read as a disjunctive, only one of the misleading advertisements may be penalized. Because the purpose of the act is not only to reach actual harm, but also to deter the dissemination of misleading information, the trial court must be permitted to assess civil penalties for both actual harm caused and the dissemination of the false advertisement.

19. The potential concern of excessive penalties assessed under the civil penalty scheme adopted by the General Assembly and this court is relieved by the statutory cap on each violation of $2,000 and of $100,000 for a related series of violations.

20. In its June 27, 1990, order, the trial court stated:

IT IS FURTHER ORDERED that May D & F shall forfeit and pay to the general fund of the State of Colorado a civil penalty of two-thousand dollars ($2,000) for each of the four consumers who testified at trial who were victims of May D & F's deceptive practices.

21. The trial court ordered that May D & F:

1. Is hereby permanently enjoined from its practice of using a price for merchandise established as its promotional mark-up (PMU), as a reference price for the purpose of price comparison advertising, unless May D & F fully and completely discloses to consumers its method of determining such PMU coincident with said price comparison advertising.
2. Is hereby permanently enjoined from using reference price terms which have meanings unique to May D & F or reference price terms whose commonly understood meaning by reasonable persons is different than that used by May D & F, unless coincident with its price comparative advertisement a glossary defining such reference term is communicated. For example, when defendant May D & F used the reference term "regular" price in its comparative price advertising, it shall disclose coincidentally its unique definition of the word:
   A regular price is established by offering the merchandise at the price initially for ten consecutive days and, after the initial ten-day offering period, the merchandise will be at the regular price for at least twenty-eight out of every ninety days. The ten-day offering period is included in the twenty-eight days.
3. May D & F is hereby permanently enjoined from advertising sales of limited duration in such manner as to communicate to consumers a false sense of urgency to purchase. For example, consumers should be accurately informed that sales such as "4 Day Only Sale" is one of several such sales planned during the selling season during which the same or similar prices are offered, if that is in fact the case.

(5) for a reasonable period of time, the trial court should require May D & F to file periodic reports demonstrating it is in compliance with the injunction; and (6) those aspects of the trial court's order which are not affected by this order remain in place, *i.e.*, disclaimer information pertaining to short term sales.

*May Dep't Stores Co.*, 849 P.2d at 808.

May D & F contends the court of appeals substituted its judgment for that of the trial court's by (1) overruling the trial court's decision to use compulsory disclosures to remedy the violations and instead requiring the trial court to unconditionally enjoin May D & F's comparative advertising practices; (2) mandating the use of a twenty-eight day minimum reference price offering period for each ninety-day sales period; and (3) requiring the trial court to monitor May D & F's advertising practices. While we agree that the trial court's order was insufficient because it did not enjoin May D & F's underlying fraudulent practices, we hold that the court of appeals erred in ordering the entry of different injunctive relief. Therefore, we reverse the court of appeals order for injunctive relief and return this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

### A

■ An injunction is an extraordinary and discretionary equitable remedy which is available when there is no adequate remedy at law, or when authorized by statute. An injunction is intended to prevent future harm. *Snyder v. Sullivan*, 705 P.2d 510 (Colo.1985); *American Investors Life Ins. Co. v. Green Shield Plan, Inc.*, 145 Colo. 188, 358 P.2d 473 (1960); *Goldammer v. Fay*, 326 F.2d 268 (10th Cir.1964). The CCPA allows the trial court to enjoin fraudulent activity.[22] § 6–1–110,

2 C.R.S. (1992). Appellate courts in trade regulation cases have a duty to ensure that the decree fashioned by the trial court will effectively redress and prevent future violations. *United States v. E.I. du Pont De Nemours & Co.*, 366 U.S. 316, 323, 81 S.Ct. 1243, 1248, 6 L.Ed.2d 318 (1961) (stating that "the suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it"). Both injunctions and disclosure requirements can be adequate and have been held to be accepted vehicles to prevent deceptive advertising. *Grolier Inc. v. F.T.C.*, 699 F.2d 983 (9th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983); *Encyclopaedia Britannica, Inc. v. F.T.C.*, 605 F.2d 964 (7th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *In re Thompson Medical Co.*, 104 F.T.C. 648 (1984).

■ We agree with the court of appeals that the injunctive remedy provided by the trial court was not adequate to address May D & F's violations of the CCPA.[23] The trial court mandated disclosure as the primary method of enjoining the deceptive advertising practices of May D & F. Although disclosure may be an adequate remedy in some cases, disclosure in this case does not effectively eliminate the advertising practices which are fraudulent, deceptive, and misleading. Therefore, the court of appeals properly required the trial court to enjoin May D & F's fraudulent practices.

■ In some instances, disclosure is an adequate remedy and sufficiently corrects the fraudulent and misleading advertising practices. *See F.T.C. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C.Cir.1985); *see also Amrep Corp. v. F.T.C.*, 768 F.2d 1171, 1180 (10th Cir.1985) (upholding disclosure to dissipate misimpressions for sale of land); *Grolier, Inc.*, 699 F.2d at 983 (upholding mandatory dis-

---

22. We do not address the issue of whether the injunctive remedy available in the CCPA is mandatory. We agree with the court of appeals that an injunction was appropriate in this case.

23. The court of appeals stated:
(1) the disclaimer approach is inadequate to remedy the fraudulent advertising scheme;

(2) May D & F must be enjoined from using deceptive procedures, including fictitious PMU prices, in selling its products in the Home Store;

*May Dep't Stores Co.*, 849 P.2d at 808.

closure to prospective book purchasers); *Encyclopaedia Britannica, Inc,* 605 F.2d at 964 (same). In some instances, disclaimers do not adequately protect against the reoccurrence of the prohibited conduct. *Brown & Williamson Tobacco Corp.,* 778 F.2d at 43. Disclaimers can be ineffective and may be disregarded by a consumer who is confused by the disclosure. *Id.* In some cases where a court has ordered a disclaimer, the false advertising claims were first enjoined. *Thompson Medical Co., Inc. v. F.T.C.,* 791 F.2d 189 (D.C.Cir. 1986); *Matter of McMillan, Inc.,* 96 F.T.C. 208, 239–48 (1980). An advertiser should not be permitted to continue to make false advertising claims by asserting that it has disclosed its method for deception. Thus, when advertising is false, disclosures will not eliminate the underlying deception. *Brown & Williamson Tobacco Corp.,* 778 F.2d at 43; *Kraft, Inc. v. F.T.C.,* 970 F.2d 311, 325 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1254, 122 L.Ed.2d 652 (1993).

This case concerns whether May D & F's advertised promotional reference prices were bona fide savings claims, and not whether the consumer was confused by the terms "original" or "regular." The trial court concluded that May D & F's reference prices, under both the 1986 and 1989 policies, were not bona fide and constituted false advertising claims which violated the CCPA.[24]

The failure to disclose, as the trial court found, was only one of the obvious reasons for the deception. The trial court, however, also concluded that May D & F's advertising pursuant to its 1989 policy violated the CCPA because May D & F's price was not a bona fide price but a subjective, artificial, and inflated price intended to facilitate subsequent advertising of large reductions. This is precisely the basis on which the trial court invalidated May D & F's advertising under its 1986 policy—where there is no dispute that May D & F violated three sections of the CCPA.

Although the trial court found May D & F's false reference prices to be the source of the deception, the trial court failed to prohibit the continued use of such false prices, opting instead for a simple disclosure of May D & F's pricing terminology. The definition of the term "regular" will not by itself, transform a false claim into a true claim. The ineffectiveness of the trial court's disclosure remedy is best demonstrated by comparing May D & F's Home Store advertisements after the trial court's order with those that were found to violate the CCPA. The advertisements are virtually identical. May D & F's post-order advertisements contained the same false reference prices and false savings claims as the pre-order advertisements, with the only difference being a disclosure that "regular" prices were based on, among other considerations, "subjective" factors.[25] In order to comply with the mandate of the statute, the trial court may not merely require the disclosure of terminology, it must require elimination of the false claims.

---

24. May D & F contends that the 1989 modifications to the price comparison advertising obviate the need for an injunction. However, cessation or modification of an unlawful practice does not obviate the need for injunctive relief to prevent future misconduct. *Old Homestead Bread Co. v. Marx Baking Co.,* 108 Colo. 375, 380, 117 P.2d 1007, 1010 (1941). According to the United States Supreme Court:

It is the duty of courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment [of the unlawful practice] seems timed to anticipate suit, and there is probability of resumption.

*United States v. Oregon State Medical Soc.,* 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952).

25. May D & F's disclaimer states:

Pricing Policy: Advertised merchandise in the Home Store may be available at these or similar sale prices in upcoming sales this season. Reference prices are based upon competitors' prices for similar merchandise mfgs.' suggested retails, and other factors, including subjective ones. Regular prices are established by offering merchandise initially for 10 consecutive days at the regular price, and afterward by offering the merchandise at the regular price for at least 28 out of every 90 days. The 10 day offering period is included in the 28 days. Original price is used with merchandise whose prices we have permanently reduced.

The CCPA was enacted to "protect the public" and to "abate evils which are deemed to arise from the pursuit of business." *Gym of America, Inc.,* 177 Colo. at 112, 493 P.2d at 667. The CCPA provides that the attorney general may "apply for and obtain" an injunction prohibiting the continuation of deceptive trade practices. § 6–1–110(1), 2 C.R.S. (1992). The statute further provides that the district court may "make such orders or judgments as may be necessary to prevent the use or employment . . . of any such deceptive trade practices." *Id.*

Mere disclosures or disclaimers are not sufficient to stop the practices May D & F employed in its false and deceptive advertising scheme. The trial court's injunctive order does not adequately prohibit (1) the advertising of goods with the intent not to sell them as advertised, section 6–1–105(1)(i), or (2) prohibit the making of false statements concerning the price of goods or the existence or amounts of price reductions, section 6–1–105(1)(*l*). Because the trial court found May D & F violated these prohibitions in the CCPA and did not enjoin them, the trial court erred in failing to carry out the requirements of the CCPA. We therefore affirm the court of appeals and hold the trial court's injunctive remedy was inadequate and return this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

B

■ The court of appeals held that the trial court's injunctive remedy was inadequate and ordered the trial court to include in its injunction the following specific terms: (1) May D & F must maintain the PMU price for twenty-eight out of every ninety days; and (2) the trial court must monitor May D & F's compliance with the injunction. Because the trial court is in the best position to fashion an appropriate remedy, the court of appeals erred in requiring the trial court to enter specific injunctive relief.

Although an appellate court is not without power to modify or limit a trial court's order for injunctive relief upon a showing that such relief either is inadequate as a matter of law or amounts to an abuse of discretion, it is neither necessary nor appropriate in this case for the court of appeals to prescribe for the trial court the exact contours of the remedy. *Colorado Springs Bd. of Realtors, Inc. v. State,* 780 P.2d 494, 499 (Colo.1989) (remanding case to trial court with directions to enter a modified injunctive order); *Village of Sister Bay v. Hockers,* 106 Wis.2d 474, 317 N.W.2d 505, 508 (App.1982) ("Injunctive relief is ordered in the discretion of the trial court, and this court will not change the trial court's decision in the absence of abuse of discretion."); *Union Interchange, Inc. v. Savage,* 52 Cal.2d 601, 342 P.2d 249, 252 (1959); *Western Auto Supply Co. v. Chalcraft,* 16 Ill.App.2d 461, 148 N.E.2d 592, 595 (1958) ("It is true that courts of review sometimes dissolve or order modification of injunctions on appeal, but this is usually in cases where the chancellor has made some error of law."). The consumer is the ultimate arbiter of what advertising practices are deceptive, 1A L. Altman, *Callman's The Law of Unfair Competition, Trademarks and Monopolies* § 5.04, at 5–32 (4th ed. 1981), and the trial court has the best view of consumer perception. *See McNeilab, Inc. v. American Home Products Corp.,* 501 F.Supp. 517, 525 (S.D.N.Y.1980) (stating that "the court must . . . rely on its own experience and understanding of human nature in drawing reasonable inferences about the reactions of consumers to the challenged advertising").

■ The court of appeals, in considering the record and the injunctive order issued by the trial court, can approve or limit the injunctive remedy, but cannot impose new or different injunctive relief. Although the court of appeals correctly determined *what* the remedy should encompass to give effect to the intent and purposes of the CCPA, it erred in determining *how* the trial court should implement the intent and purpose of the statute by means of the

injunction.[26] Given that disclosure is not sufficient to satisfy the intent and purpose of the CCPA, the trial court must determine what injunctive relief should be granted to comply with the CCPA.

In light of the fact that the trial court's order was issued nearly three and one-half years ago, some supplemental fact-finding may be necessary to fashion an appropriate order. Furthermore, we have no reason to believe that the trial court will be either unable or reluctant to fashion appropriate injunctive relief on remand. Therefore, there is no compelling reason in this case for this court or the court of appeals to displace the normally broad discretion of the trial court to issue injunctive relief in accordance with the principles set forth in this opinion.

## IV

For the foregoing reasons, we affirm the court of appeals interpretation of the CCPA, reverse the court of appeals order for injunctive relief and return this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

---

**26.** Although the trial court is in the best position to fashion a remedy, and we held, *supra,* that disclosure is inadequate to effectuate the purposes of the CCPA, we are not substituting our judgment for that of the trial court. Rather than fashioning relief and expanding the trial court's injunction as the court of appeals did, by requiring more than disclosure we merely state that the trial court did not give effect to the intent of the statute.