Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2016 CO 54**

**No. 16SA8, State v. The Castle Law Grp., LLC—Colorado Consumer Protection Act—
Deceptive Trade Practice—Disclosure.**

The State filed an enforcement action against The Castle Law Group and its
affiliated vendors, alleging, inter alia, violations of the Colorado Consumer Protection
Act ("CCPA"), §§ 6-1-101 to -115, C.R.S. (2015). The State alleges that the defendants
engaged in a deceptive trade practice in violation of the CCPA by generating and
submitting deceptive invoices reflecting systematically inflated costs incurred for
foreclosure-related services, while falsely representing to mortgage servicers that these
inflated costs were "actual, necessary, and reasonable." In this original proceeding, the
supreme court holds that, for purposes of a deceptive trade practices claim under the
CCPA, disclosure of a price charged does not automatically insulate a party from claims
that the price is deceptive. The supreme court further holds that evidence of the market
rates charged by unaffiliated vendors for foreclosure-related services is directly relevant
to establishing whether the costs invoiced by the vendors were the actual or reasonable
costs of such services. The supreme court therefore reverses a trial court order
excluding testimony concerning the market rate for foreclosure-related services.

**2016 CO 54**

**Supreme Court Case No. 16SA8**
*Original Proceeding Pursuant to C.A.R. 21*
District Court, City and County of Denver, Case No. 14CV32763
Honorable Morris B. Hoffman, Judge

**In Re**

**Plaintiffs:**

The State of Colorado ex rel. Cynthia H. Coffman, Attorney General for the State of Colorado and Julie Ann Meade, Administrator, Uniform Consumer Credit Code,

v.

**Defendants:**

The Castle Law Group, LLC; Absolute Posting & Process Services, LLC; RE Records Research, LLC, d/b/a Real Estate Records Research; Colorado American Title, LLC; Lawrence E. Castle; Caren A. Castle; Ryan J. O'Connell; and Kathleen A. Benton.

**Rule Made Absolute**
*en banc*
July 5, 2016

**Attorneys for Plaintiffs:**
Cynthia H. Coffman, Attorney General
Frederick R. Yarger, Solicitor General
Alissa Gardenswartz, Deputy Attorney General
Erik R. Neusch, Senior Assistant Attorney General
Megan Paris Rundlet, Senior Assistant Attorney General
Lauren M. Dickey, Assistant Attorney General
Rebecca M. Taylor, Assistant Attorney General
Mark L. Boehmer, Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Defendants The Castle Law Group, LLC; Lawrence E. Castle; and Caren A. Castle:**
Reilly Pozner LLP
Larry S. Pozner
Ellie Lockwood
  *Denver, Colorado*

**Attorneys for Defendants RE Records Research, LLC, d/b/a Real Estate Records Research; and Colorado American Title, LLC:**
Vedra Wali LLC
Daniel J. Vedra
  *Denver, Colorado*

**Attorneys for Defendants Absolute Posting & Process Services, LLC; Ryan O'Connell; and Kathleen Benton:**
Senter Goldfarb & Rice, L.L.C.
Billy-George Hertzke
Margaret L. Boehmer
Ashley J. DeVerna
  *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents, and **JUSTICE HOOD** joins in the dissent.

¶1 Following a two-year investigation into the Colorado foreclosure industry, the State brought a civil law enforcement action against the foreclosure law firm The Castle Law Group, LLC and its principals, Lawrence Castle and Caren Castle (collectively, "Castle"), as well as Castle's affiliated vendors, Absolute Posting & Processing Services, LLC, Ryan O'Connell, Kathleen Benton (collectively, "Absolute"), RE Records Research, LLC ("RERR"), and Colorado American Title, LLC ("CAT"). Among other things, the State alleges that between 2009 and 2014, the Castle defendants conspired with their affiliated vendors to generate and submit deceptive invoices reflecting systematically inflated costs incurred for foreclosure-related services, while falsely representing to mortgage servicers that these inflated costs were "actual, necessary, and reasonable." According to the State, Castle submitted the vendors' inflated invoices to the mortgage servicers, and in turn, the mortgage servicers, relying on Castle's false representation that the vendors' charges were "actual, necessary, and reasonable," reimbursed Castle for these costs as part of the foreclosures and ultimately passed the inflated costs on to the public. The State contends that all the defendants benefitted from this scheme by collectively reaping millions in inflated profits from homeowners, purchasers of foreclosed homes at auction, and taxpayer-funded investors like Fannie Mae and Freddie Mac. Specifically, it alleges that Castle pocketed some of these overages as kickbacks from the vendors to circumvent the maximum allowable fees Castle could collect, but also contends that Castle's affiliated vendors were unjustly enriched by this scheme. The State alleges that the defendants' conduct violated the Colorado Consumer Protection Act ("CCPA"), §§ 6-1-101 to -115, C.R.S. (2015), as well as the

3

Colorado Antitrust Act of 1992, §§ 6-4-101 to -122, C.R.S. (2015), and the Colorado Fair Debt Collection Practices Act, §§ 12-14-101 to -136, C.R.S. (2015). Only the CCPA claim is at issue in this original proceeding pursuant to C.A.R. 21.

¶2 Relevant here, the State seeks to demonstrate at trial that the costs for foreclosure-related services charged by Castle's affiliated vendors and claimed by Castle were not, in fact, the "actual, necessary, and reasonable" costs for such services. Specifically, the State seeks to demonstrate that these costs were artificially inflated by comparing the invoiced rates submitted by Castle with the market rates charged by unaffiliated vendors for such services. The State retained an expert witness, Matthew Lausten, to testify, among other things, regarding the "overage" amounts Defendants obtained from their alleged deceptive trade practices as reflected by the difference in the invoiced costs and the "market rate" prices charged by unaffiliated vendors for the same services.

¶3 On January 7, 2016, approximately a week before the scheduled trial, the district court issued an order granting Castle's motion to limit Lausten's testimony and granting in part Absolute's motion to exclude Lausten's testimony, albeit not based on the CRE 702 reliability and relevance grounds raised in the motions. Instead, the court concluded that the market rates for foreclosure-related services are "irrelevant to Plaintiffs' cognizable claims." The court construed the State's CCPA deceptive trade practice claim to be grounded on the allegation that the Castle defendants exceeded their allowable fees by charging additional fees in the guise of costs for foreclosure-related services. The court reasoned that "[i]t doesn't matter whether those

4

charges were over or under 'market' rates; what matters is if any portion of them found their way to the Castle Defendants as disguised attorney fees . . . ."

¶4     In response to the State's motion for clarification of this order, the court issued another order on January 11, 2016, ruling that "[c]harging high prices is not deceptive or unjust, as long as those prices are accurately disclosed.  Charging high prices is not unlawful, as long [sic] those prices have not been capped by state price controls and are not the product of an antitrust violation."  The court further noted that it read the State's complaint to allege that Castle received some portion of the high prices as kickbacks from the vendors in a scheme to avoid contractual or regulatory caps on their attorney fees.  The court ruled that this allegation is the "only strand keeping [the State's non-antitrust] claims alive, and it is the only strand on which I will permit evidence."

¶5     The State sought review of the district court's January 7 and January 11 Orders pursuant to C.A.R. 21.  The State contends that by excluding market rate evidence, the trial court sua sponte dismissed one of the theories that formed the basis of the State's CCPA claim and its disgorgement calculations.  We issued a rule to show cause.

¶6     Consistent with our decision in <u>May Department Stores Co. v. State ex rel. Woodard</u>, 863 P.2d 967 (Colo. 1993), we hold that, for purposes of a deceptive trade practices claim under the CCPA, disclosure of a price charged does not automatically insulate a party from claims that the price is deceptive.  Here, the State's CCPA claim alleges that the Castle defendants engaged in a scheme with the vendors to generate invoices with greatly inflated charges for foreclosure-related services, while Castle

5

falsely represented to mortgage servicers that these charges were the "actual, necessary, and reasonable" costs for such services. That the invoices disclosed the prices charged for foreclosure-related services misperceives the alleged deception: namely, that these prices were not, in fact, the "actual, necessary, and reasonable" costs for such services. Evidence of the market rates charged by unaffiliated vendors for such services is directly relevant to establishing whether the costs invoiced by the vendors were the actual or reasonable costs of such services. Market rate evidence is further relevant to the State's allegation that the vendors themselves also benefitted from the common scheme and serves as a benchmark for the State's disgorgement calculations. We therefore conclude that the trial court abused its discretion in barring evidence of market rates for foreclosure-related services. Accordingly, we make our rule absolute and remand the matter to the trial court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶7 The State alleges that Castle, in conjunction with its affiliated vendors, systematically misrepresented and inflated the costs for foreclosure-related services in more than 100,000 foreclosures in Colorado. The State's expert witness report estimates that Castle passed on over $25 million in price inflation to mortgage servicers such as Fannie Mae. According to the State, these deceptively inflated costs were then passed on to, and ultimately borne by, investors and insurers of the loan, third-party purchasers acquiring the property at auction, and home owners trying to save their homes.

6

## A. The State's Complaint

¶8 The State's CCPA claim rests on the allegation that Castle, in concert with their affiliated vendors, systematically charged inflated and deceptive costs for posting foreclosure notices, obtaining title products, preparing documents, and providing other foreclosure-related services by using affiliated vendors to create invoices for foreclosure services at costs that are grossly inflated above the actual costs and above what unaffiliated vendors charge for such services (i.e., the "market rate" for such services). Am. Compl. at ¶ 2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Apr. 15, 2015). The State alleges that the allowable fees and costs charged by a law firm conducting foreclosures are governed by the mortgage loan documents, servicer agreements, investor guidelines, and state law. Id. at ¶ 58. With respect to the allowable costs, the State alleges that the servicer agreements require that costs passed along to the servicer/investor must be "actually incurred, necessary to complete the foreclosure, and reasonable, i.e., market rate," id. at ¶ 60, and that accordingly, Castle agreed to seek reimbursement for only its "actual, necessary, and reasonable (i.e., market rate) costs," id. at ¶ 59. The State alleges that the servicer has little incentive to scrutinize these costs because it ultimately passes these costs on to others, namely homeowners, investors, and insurers. Id. at ¶ 63. Consequently, the servicers rely on the law firm's representations that it will comply with the agreements and investor guidelines and pass through only its "actual, necessary, and reasonable" costs. Id. at ¶ 3; see also id. at ¶¶ 59, 60, 64, 69, 72, 167.

7

¶9 The gravamen of the State's CCPA claim in this case is that the invoiced costs submitted by Castle for reimbursement from the mortgage servicers were not, in fact, actual, necessary, or reasonable, as Castle (falsely) represented. See id. at ¶¶ 2, 3, 7, 12, 49, 59, 60, 73, 83, 120, 127, 151, 156, 162, 163, 166. The State's amended complaint repeatedly equates "reasonable" costs in this context with the market rate charged by unaffiliated vendors for such costs. Id. at ¶¶ 3, 7, 12, 59, 60, 64, 69. For example, the State alleges that $125 was not the actual or market rate cost for posting a foreclosure notice on a door, id. at ¶¶ 7, 20, 83, 122; that $275 was not the actual or market rate cost for a title search, id. at ¶¶ 20, 166, 179; and that $75 was not the actual or market rate cost for a title search update, id. at ¶¶ 20, 179, 181. The State alleges that Castle pocketed some of these overages as kickbacks from the vendors to skirt contractual and regulatory limits on the attorney fees Castle could charge. Id. at ¶¶ 63, 65, 66, 73, 171. However, it also alleges that its vendors were unjustly enriched by this scheme. Id. at ¶¶ 74, 217.

## B. Pre-Trial Motions and Discovery

¶10 In October 2014, defendants RERR and CAT filed a motion to dismiss under C.R.C.P. 12(b)(5), arguing that the State's complaint failed to state a CCPA claim against them. The motion asserted that the State's complaint alleged only that the defendants charged too high a price for their services, not that the invoices contained fraudulent prices. The State responded that its complaint alleged that the invoiced costs were deceptive because the mortgage servicer relied on Castle's false representation that the

8

costs were "actual, reasonable, and necessary" and therefore the defendants' alleged scheme to charge the inflated prices generated millions of dollars in unlawful profits.

¶11 The trial court denied the motion to dismiss. In its order denying the motion, the court noted that it agreed with the defendants' contention that charging "an amount 'above the market price'" is not actionable under the CCPA as long as the amounts charged "were accurately disclosed and billed" and the title work was actually performed. Order at 3, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Nov. 13, 2014) [hereinafter "November 2014 Order"]. The trial court went on, however, to state that the gravamen of the State's CCPA claim against these defendants was that they acted in concert with the Castle defendants to misrepresent and overstate the actual cost of their title work as part of an alleged scheme to hide the real price of the Castle defendants' attorney fees. Despite the court's comments regarding market price, the November 2014 Order did not expressly limit the scope of the State's CCPA claim or bar evidence of market rates.

¶12 Indeed, it appears from the record before us that, following the trial court's November 2014 Order, all parties continued with discovery assuming that the State would present evidence of the market rates charged by unaffiliated vendors for foreclosure-related services. For example, in April 2015, Absolute served discovery requests asking the State to identify the vendors from which the State established its market rate data and to produce any documents with their listed prices. In May 2015, Castle served discovery asking the State to identify the vendors that provided foreclosure-related services at the State's alleged market rate. Castle also asked the

State to detail its methodology and provide supporting documentation for determining the market rates for foreclosure-related services. In July 2015, both Castle and Absolute served C.R.C.P. 30(b)(6) deposition notices to the State, seeking testimony on the State's market rate allegations.

¶13 In November 2015, Absolute filed a motion for summary judgment. In an order dated December 28, 2015, the trial court denied the motion with respect to the State's CCPA claim, concluding that genuine issues of material fact existed as to whether Castle received kickbacks, either directly or indirectly, from Absolute. Relevant here, Absolute argued in its motion that the complaint presented no evidence that the $125 it charged for a foreclosure posting was inflated beyond the market price and that the State's evidence of market price was cherry-picked and not reliable. The court rejected these arguments "for the simple reason that market price is not an issue in this case." Order at 2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Dec. 28, 2015) [hereinafter "December 2015 Order"]. The December 2015 Order did not, however, expressly limit the scope of the State's CCPA claim or bar evidence of market rates. The court rejected Absolute's contention that the State could not establish that the alleged deceptive trade practice significantly impacted the public, noting that the State "will have to prove[] that the Absolute Defendants conspired with the Castle Defendants to inflate the Castle Defendants' permissible fees," thus injuring Castle's clients—an injury that the court noted "may well reverberate downstream to buyers who would have to pay these inflated fees." Id. at 3.

## C. January 2016 Orders

¶14 The January 2016 Orders at issue in this case issued a little over a week after the court's ruling on Absolute's motion for summary judgment. These orders addressed Castle's and Absolute's separate motions to limit or exclude the expert testimony of the State's expert witness, Matthew Lausten. The State retained Lausten to testify regarding (1) the relationship between Castle, the affiliated vendors, and a series of entities that the State alleged were used to funnel proceeds of the deceptive costs back to Castle; (2) the monies flowing back to Castle; and (3) the "overage" amounts the defendants obtained through the alleged deceptive trade practice, as reflected by the difference between the invoiced charges and the "market rate" prices that unaffiliated vendors charged for the same services. Lausten did not independently research the market rate for these services but relied in his expert report on the market rate information provided to him by the State.

¶15 On December 14, 2015, Absolute and Castle separately moved to strike some or all of Lausten's testimony. The defendants challenged the reliability of Lausten's conclusions under CRE 702 and the relevance of certain aspects of his report; however, neither defendant contended that the market rates for foreclosure-related services were irrelevant to the State's CCPA claim.

¶16 In an order dated January 7, 2016, the court granted Castle's motion to limit Lausten's testimony and granted Absolute's motion to exclude Lausten's testimony as to the market rates for foreclosure-related services. Order at ¶¶ 1–2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Jan. 7, 2016) [hereinafter "January 7

11

Order"]. The court stated, "As I indicated in my Order dated December 28, 2015, the market rates for posting, serving or title work are themselves irrelevant to Plaintiffs' cognizable claims." Id. at ¶ 1. The court characterized the State's CCPA claim as grounded on the allegation that the Castle defendants "exceeded their contracted-for or regulated fee limits by charging excess fees in the guise of posting, serving or title charges." Id. The court reasoned that "[i]t doesn't matter whether those charges were over or under 'market' rates; what matters is if any portion of them found their way to the Castle Defendants as disguised attorney fees in sufficient amounts and under circumstances making the scheme deceptive." Id. The court then observed in a footnote that it would "discuss at the pretrial conference the morning of trial which witnesses will now NOT be testifying . . . given that market rates are not part of this case . . . ." Id. at ¶ 1 n.1.

¶17     The State moved for clarification of the court's order. The State reiterated its allegation that the defendants worked in concert to create deceptive invoices containing inflated charges for foreclosure-related services and that all defendants, not just Castle, were unjustly enriched as a result of this common scheme. The State expressed concern that the January 7 Order mistakenly viewed the State's CCPA claim to assert that the costs charged by defendants were deceptive only to the extent that a portion of those costs were routed to Castle's benefit, and that the Order would limit the State's claims of unjust enrichment to the amount that Castle benefited, rather than considering the unjust gains obtained by all the defendants. The State argued that its allegations of "deception" lie not just in the fact that a portion of the costs inured to Castle's benefit as

12

hidden attorney fees, but also in the fact that all the defendants worked together to create invoices reflecting charges unrelated to actual costs and well above what unaffiliated vendors could charge, thereby unjustly enriching all the defendants. The State noted that the court's January 7 Order appeared to significantly shift the landscape regarding the State's CCPA claim and unjust enrichment calculations without giving the State the opportunity to present argument on these issues. The State thus sought clarification of the court's intent.

¶18    In an order dated January 11, 2016, the court responded that it was "surprised [this clarification] is necessary at this late date," but that the court would "re-state the rulings [it] ha[s] made throughout this case." Order at 1, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Jan. 11, 2016) [hereinafter "January 11 Order"]. The court ruled that:

> Charging high prices is not deceptive or unjust, as long as those prices are accurately disclosed. Charging high prices is not unlawful, as long as those prices have not been capped by state price controls and are not the product of an antitrust violation. Incanting legally unrecognizable phrases such as "vastly inflated invoices" does not change the state of affairs. The only reason I did not knock out all of the non-antitrust claims on dispositive motions is because I read Plaintiff's complaint to allege that some part of these high prices were kicked back to the Castle Defendants in a scheme to avoid contractual or regulatory caps on their attorney fees. That is the only strand keeping these claims alive, and it is the only strand on which I will permit evidence.

¶19    The State then petitioned this court to review the district court's January 7 and January 11 Orders pursuant to C.A.R. 21.

13

## II. C.A.R. 21 Jurisdiction

¶20 Under C.A.R. 21 we will review a trial court's order "where the trial court has abused its discretion and where appellate remedy would not be adequate." People v. Darlington, 105 P.3d 230, 232 (Colo. 2005). The decision to exercise original jurisdiction pursuant to C.A.R. 21 lies entirely within the discretion of the court. Fognani v. Young, 115 P.3d 1268, 1271 (Colo. 2005). We have exercised original jurisdiction to review pretrial orders entered by trial courts that "will place a party at a significant disadvantage in litigating the merits of the controversy." People v. Dist. Court, 664 P.2d 247, 251 (Colo. 1983). Here, the State contends that the trial court's January 7 and January 11 Orders significantly altered the scope of its CCPA claim shortly before trial, placing the State at a significant disadvantage. We conclude that the State has no other adequate remedy and that exercise of our original jurisdiction is appropriate to provide an expedited resolution.

## III. Analysis

¶21 As described at length above, the State seeks to show that the defendants engaged in a deceptive trade practice in violation of the CCPA by conspiring to generate invoices falsely representing that the costs they charged for foreclosure-related services were actual, necessary, and reasonable, when in fact (the State alleges), those costs bore no reasonable relationship to the defendants' actual costs or to the rates for such services that prevailed in the market at the time. The trial court concluded, as a matter of law, that evidence of the market rates charged by unaffiliated vendors for such services was irrelevant to the State's CCPA claim. We disagree.

14

¶22 The CCPA is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public. Showpiece Homes Corp. v. Assurance Co. of Am., 38 P.3d 47, 50–51 (Colo. 2001). The CCPA's broad legislative purpose is to "provide prompt, economical, and readily available remedies against consumer fraud." W. Food Plan, Inc. v. Dist. Court, 598 P.2d 1038, 1041 (Colo. 1979). To state a claim under the CCPA, the State must allege, among other things, that the defendant engaged in an unfair or deceptive trade practice. Section 6-1-105 of the CCPA sets forth a host of conduct that constitutes deceptive trade practices. Relevant here, a defendant engages in a deceptive trade practice when the defendant, in the course of business, "[m]akes false or misleading statements of fact concerning the price of . . . services . . . ." § 6-1-105(1)(l), C.R.S. (2015).

¶23 The State's amended complaint alleges that the defendants engaged in an unlawful deceptive trade practice by charging artificially inflated prices for foreclosure-related services while falsely representing that the prices were the "actual, necessary, and reasonable" costs of those services. Importantly, the State's theory is not simply that the defendants charged "high prices." Rather, the alleged deception is that the prices charged were not, in fact, the actual, necessary, or reasonable costs for such services, as the Castle defendants represented. To prove its theory, the State must rely on some reference point by which to measure the actual, necessary, or reasonable cost of a particular foreclosure-related service. The State contends, and we agree, that whether the defendants' invoiced cost for a particular service is the "actual" or "reasonable" cost for such a service is informed at least in part by the market rates for such services.

15

Therefore, evidence of the market rates charged by unaffiliated vendors for such services is directly relevant to the State's CCPA deceptive trade practices claim as alleged in the amended complaint. The trial court's January Orders erroneously prevent the State from introducing evidence tending to show that the costs charged by the defendants were not the actual and reasonable costs for such services because they bore no relation to the market rates charged by unaffiliated vendors for the same services.

¶24 Although the defendants assert that the trial court's November 2014 Order previously ruled that market rate evidence was irrelevant, we do not read that order to bar the State from presenting such evidence at trial or otherwise to limit the scope of the State's CCPA claim. It is clear from the subsequent filings in the case that all parties continued to assume that the State intended to rely on market rate evidence to support its deceptive trade practice claim.

¶25 The defendants also point to a handful of rulings between the November 2014 Order and the January 2016 Orders that referenced or briefly described the State's allegations that Castle received kickbacks through its scheme with its vendors.[1] The defendants contend that these orders likewise reveal that the court previously determined that evidence of market rates was irrelevant to the State's CCPA claim. None of these orders, however, actually dismissed any portion of the State's case or

---

[1] See Orders dated December 3, 2014 (denying Absolute's motion to dismiss); May 15, 2015 (granting in part and denying in part Castle's motion to compel); September 14, 2015 (denying State's motion to compel and a third party's motion to quash).

suggested that the State's CCPA claim was limited to its allegations of kickbacks, nor did any of these orders purport to bar the State from presenting market rate evidence or otherwise dismiss its allegations that all the defendants—including the affiliated vendors—were unjustly enriched. Indeed, on January 1, 2016, the court approved the parties' proposed Trial Management Order, which described the State's claims remaining for trial. This order broadly describes the State's CCPA claim against "All Defendants" as based on "false or misleading statements of fact concerning the price of services" and alleges that the defendants "deceived and defrauded homeowners, the public, servicers, and investors/insurers, and obtained unjust enrichment." Order: Proposed Trial Management Order attach. at 2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Jan. 1, 2016).

¶26 Finally, Absolute and Castle's December 2015 motions seeking to limit the testimony of the State's expert witness—the motions that gave rise to the January 2016 Orders under review here—presupposed the relevance of the market rate testimony. These motions did not contend that market rate evidence was irrelevant to the State's CCPA claim; instead, they largely challenged the reliability of the expert's conclusions. In short, no defendant sought to limit the scope of the State's CCPA claim, and the parties all continued to assume the relevance of market rate evidence despite the court's comments in its November 2014 ruling.

¶27 To the extent that the court held in its January 11 Order that "[c]harging high prices is not deceptive or unjust, as long as those prices are accurately disclosed," this was error. In May Department Stores Co. v. State ex rel. Woodard, 863 P.2d 967 (Colo.

17

1993), this court rejected the contention that disclosure of a price necessarily cures any underlying deception with respect to that price. There, May Department Stores set its retail prices using comparative-price advertising. Id. at 970. To suggest to customers that its "sale" prices were discounted, the store presented a fictitious, inflated reference price as the "original price" on the advertisement. Id. The store informed its customers through in-store displays and media advertisements that the "sale" price was a substantial reduction from the "original" price. Id. The trial court determined that May Department Stores knew that the merchandise would not sell at the inflated "original" price and that the advertised "sale" price was the true regular price of the merchandise. Id. at 971. In determining appropriate injunctive relief, the trial court ordered that May Department Stores could use references to price terms such as "original price" only if it disclosed to customers its unique definition of those terms. Id. at 977 n.21.

¶28 We considered whether such disclosure was an adequate remedy for the deceptive advertisement practices. Id. at 978. Acknowledging that disclosure may be an adequate remedy to correct fraudulent and misleading advertising practices, we held that in some instances, disclosure does not "adequately protect against the reoccurrence of the prohibited conduct." Id. at 979. We noted, for example, that disclaimers may be ineffective or disregarded by a consumer who is confused by the disclosure. Id. We concluded that a retailer should not be permitted to continue to make false advertising claims by asserting it has disclosed its method for deception. Id. Thus, we concluded, "[W]hen advertising is false, disclosures will not eliminate the underlying deception."

<u>Id.</u> Importantly, we reasoned that the CCPA requires not just the disclosure of the terms of the deception, but the elimination of the false claim. <u>Id.</u>

¶29 Here, that the invoices disclosed the prices the defendants charged for foreclosure-related services does not immunize the defendants from claims that the prices themselves are deceptive. In other words, the accurate disclosure of a deceptively set price does not automatically legitimize the price or cure the alleged deception. The trial court therefore erred in concluding, as a matter of law, that charging high prices is not deceptive as long as the prices are accurately disclosed.

## IV. Conclusion

¶30 For the foregoing reasons, we hold that, for purposes of a deceptive trade practices claim under the CCPA, disclosure of a price charged does not automatically insulate a party from claims that the price is deceptive. Here, the State's CCPA claim alleges that Castle and the vendors engaged in a scheme to generate invoices with greatly inflated charges for foreclosure-related services, while Castle falsely represented to mortgage servicers that these charges were the "actual, necessary, and reasonable" costs for such services. Evidence of the market rates charged by unaffiliated vendors for such services is directly relevant to establishing whether the costs invoiced by the vendors were the actual or reasonable costs of such services. Market rate evidence is further relevant to the State's allegation that the vendors themselves also benefitted from the common scheme. We therefore conclude that the trial court abused its discretion in barring evidence of market rates for foreclosure-related services.

19

Accordingly, we make our rule absolute and remand the matter to the trial court for further proceedings consistent with this opinion.

**JUSTICE GABRIEL** dissents, and **JUSTICE HOOD** joins in the dissent.

JUSTICE GABRIEL, dissenting.

¶31    In its petition for an order to show cause pursuant to C.A.R. 21, the State asserted that one week before trial and without the benefit of briefing or argument from the parties, the district court had issued two orders, ruling sua sponte that charging high prices is not deceptive or unjust if the prices were accurately disclosed. The State claimed that (1) the district court's rulings reflected the first time that the court had suggested that the market rates for the services at issue were irrelevant to the State's case and (2) the district court's eve-of-trial rulings foreclosed the State from presenting its principal theory of the case. Based on these contentions, we issued the requested order to show cause.

¶32    Because the subsequent briefing that we received from the defendants in this case showed that the State's representations of the record were incorrect, and because it is not clear to me that the district court misunderstood the claims as set forth in the State's amended complaint, I would vacate the order to show cause and dismiss this appellate proceeding.

¶33    Accordingly, I respectfully dissent.

## I. The District Court's Rulings

¶34    In its C.A.R. 21 petition, the State challenged the district court's January 7 and January 11, 2016 orders.

¶35    In the January 7, 2016 order, the court (1) granted the motion of defendants The Castle Law Group, LLC, Lawrence E. Castle, and Caren A. Castle (the "Castle Defendants") to limit the testimony of Matthew Lausten, whom the State had

1

designated as an expert witness, and (2) granted in part and denied in part the motion of defendants Absolute Posting & Process Services, LLC, Ryan O'Connell, and Kathleen Benton (the "Absolute Defendants") to exclude Lausten's testimony. In so ruling, the court stated:

> As I indicated in my Order dated December 28, 2015, the market rates for posting, serving or title work are themselves irrelevant to Plaintiffs' cognizable claims. . . . The [Colorado Consumer Protection Act ("CCPA")] claim is grounded on the allegation that the Castle Defendants exceeded their contracted-for or regulated fee limits by charging excess fees in the guise of posting, serving or title charges. It doesn't matter whether those charges were over or under "market" rates; what matters is if any portion of them found their way to the Castle Defendants as disguised attorney fees in sufficient amounts and under circumstances making the scheme deceptive.

¶36    The next day, the State filed a motion to clarify the court's January 7, 2016 order, and this resulted in the January 11, 2016 order. In that order, the court began by stating, "I appreciate the opportunity to re-state the rulings I have made throughout this case, although I am a little surprised it is necessary at this late date." The court continued:

> Charging high prices is not deceptive or unjust, as long as those prices are accurately disclosed. Charging high prices is not unlawful, as long [as] those prices have not been capped by state price controls and are not the product of an antitrust violation. Incanting legally unrecognizable phrases such as "vastly inflated invoices" does not change this state of affairs. The only reason I did not knock out all of the non-antitrust claims on dispositive motions is because I read Plaintiff's complaint to allege that some part of these high prices were kicked back to the Castle Defendants in a scheme to avoid contractual or regulatory caps on their attorney fees. That is the only strand keeping these claims alive, and it is the only strand on which I will permit evidence.

¶37    These orders disposed of motions properly pending before the court, and thus, they were not issued sua sponte. Moreover, notwithstanding the State's assertion to the

2

contrary, it appears that the State had a full opportunity to be heard on each of these motions.

¶38 In addition, and again contrary to the State's assertions, these rulings did not reflect the first time that the district court had expressed the views set forth therein. Nor could the State reasonably claim surprise at these rulings. To the contrary, the court had expressed the same views, and it had articulated the same understanding of the State's claims, on repeated occasions beginning in November 2014 and continuing until the time that the court issued the two rulings at issue.

¶39 Specifically, the court entered the following pertinent orders, none of which was attached to the State's C.A.R. 21 petition:

- November 13, 2014—in denying a motion to dismiss filed by defendants RE Records Research, LLC ("RERR") and Colorado American Title, LLC ("CAT"), the court agreed with these defendants' argument that "charging an 'inflated' amount, or an amount 'above the market price,' is meaningless and non-actionable as long as the amounts RERR and CAT charged the Castle Defendants were accurately disclosed and billed." The court further noted its understanding of "the gravamen of Plaintiffs' CCPA claim" against these defendants, which was that "they acted in concert with the Castle Defendants to misrepresent the amount of the Castle Defendants' attorney fees to their creditor clients, as well as to Fannie Mae and Freddie Mac." The court explained that the State had alleged that Fannie Mae and Freddie Mac had negotiated a flat attorney fee with the Castle Defendants and that the Castle Defendants had effectively exceeded those flat fees but concealed that fact by taking additional attorney fees in the form of "inflated" costs of the title work and by using a related company, CAT, to do so. Finally, the court observed that the State had alleged that the Castle Defendants had received payments back from RERR in various forms. The court concluded that these allegations were sufficient to state CCPA claims against RERR and CAT because those defendants' conduct was "part and parcel of Defendants' alleged scheme to hide the real price of the Castle

3

Defendants' attorney fees by overstating the actual cost of the title work."

- December 3, 2014—the court denied a motion to dismiss filed by the Absolute Defendants. As pertinent here, the court concluded that the State had sufficiently pleaded a CCPA claim by alleging that (1) the Absolute Defendants had "conspired with the Castle Defendants to increase their posting charges as a way to charge their lending clients more than the maximum legal fees they agreed with Fannie Mae and Freddie Mac to charge" and (2) the Absolute Defendants billed these artificially inflated rates and then "kicked back" a portion of those charges to the Castle Defendants.

- May 15, 2015—the court granted in part and denied in part the Castle Defendants' motion to compel and for sanctions against the State. In so ruling the court referred back to its November 13, 2014 order and reiterated its view that "there is no cognizable legal claim for 'inflated' costs." The court added, however, that it read the State's claims to allege that

> what the Castle Defendants were really doing was charging attorney fees in excess [of] their agreed-to limits in the guise of these other foreclosure costs, which ultimately they received either indirectly, because these providers were related entities formed by the Castle Defendants, or directly, because unrelated providers kicked some portion of these costs back to the Castle Defendants.

The court further stated, "I agree with Plaintiffs that it is these claims, and not the subject matter of Plaintiffs' investigation into the foreclosure industry generally, that define the boundaries of discoverability in this case."

- September 14, 2015—the court, in pertinent part, denied the State's motion to compel discovery from Absolute Posting. In so ruling, the court referred to "the now central issue in this case of whether the Castle Defendants inflated their fees by having Absolute Posting and other vendors inflate the costs of their services, and then pay some of that inflated cost back to the Castle Defendants."

- December 14, 2015—in ruling on the State's motion to compel discovery from a third-party and the third-party's reciprocal motion to quash a subpoena served on it, the court stated:

4

> The central fact question in this case is whether Defendants entered into a scheme with each other to enable the lawyer Defendants to charge attorney fees for foreclosure services in excess of contracted-for or regulated limits, by taking back portions of posting and title work charges from the posting and title Defendants performing those services. To prove this kickback scheme, Plaintiffs will have to prove that the lawyer Defendants, directly or indirectly, received monies back from the posting or title Defendants.

> (Footnote omitted.) The court further stated, "What matters in this case is whether the lawyer Defendants received kickbacks from posting and title providers."

- December 28, 2015—the court granted in part and denied in part the Absolute Defendants' motion for summary judgment. As pertinent here, the court denied summary judgment on the CCPA claim, finding, "Although it seems Plaintiffs have no evidence that the Absolute Defendants kicked back any 'inflated' posting or service charges directly to the Castle Defendants, it does appear that the Castle Defendants may have indirectly benefitted from these charges . . . ." In so ruling, the court rejected the Absolute Defendants' contentions that (1) there was no evidence that the price that they charged was inflated beyond the market price and (2) the State's evidence of market price was "cherry-picked" and not reliable. The court rejected these assertions "for the simple reason that market price is not an issue in this case." Finally, the court reiterated its long-held understanding of the State's allegations: "Plaintiffs contend, and will have to prove, that the Absolute Defendants conspired with the Castle Defendants to inflate the Castle Defendant's permissible fees, thus injuring the clients of the Castle Defendants."

¶40 The State does not, and in my view cannot, show that what the district court said in the January 7 and January 11, 2016 orders was different in any way from what the court had said repeatedly (and without apparent objection from the State) since November 2014. To the contrary, the above-described orders belie the State's assertions that on the eve of trial, the district court, without warning, gutted the State's case by

5

ruling sua sponte and for the first time that (1) charging high prices is not deceptive or unjust if the prices were accurately disclosed and (2) the market rates for the services at issue were irrelevant to the State's case. Accordingly, the above-described orders undermine the basis for the State's request for extraordinary relief pursuant to C.A.R. 21.

¶41 For these reasons, I would vacate the order to show cause and dismiss these appellate proceedings.

## II. The Amended Complaint

¶42 Even were I to conclude that the State's C.A.R. 21 petition warranted the granting of an order to show cause, I would not make that order absolute because the State has not persuaded me that the district court's understanding of the State's allegations was incorrect, much less so far off the mark as to require this court's extraordinary intervention.

¶43 Although, as the district court pointed out, the amended complaint is replete with conclusory allegations of inflated and above-market costs and fraud, the mere fact that the defendants allegedly charged inflated or above-market prices would not alone establish viable CCPA claims against them. Rather, as pertinent here, the State must prove that the defendants made false or misleading statements of fact concerning the prices of their services. See § 6-1-105(1)(l), C.R.S. (2015).

¶44 Here, as noted above, the district court repeatedly and consistently expressed its understanding of the false and misleading statements at issue. Specifically, the court read the State's amended complaint to allege that (1) the Castle Defendants conspired

6

with the other defendants to charge inflated prices for foreclosure-related services and (2) this scheme was devised to allow the Castle Defendants to avoid their fixed attorney fee contracts with Fannie Mae and Freddie Mac, as well as any regulatory caps on such fees.

¶45 The court's understanding finds ample support in the State's amended complaint. For example, in paragraph 65 of the amended complaint, the State alleged, "Despite agreeing to perform foreclosures for a maximum allowable fee per file, the Castle Defendants viewed this fee as insufficient. Accordingly, they devised a scheme to circumvent the maximum allowable fee by inflating foreclosure costs to make millions above and beyond the maximum allowable fee."

¶46 Likewise, in paragraph 73 of the amended complaint, the State alleged:

As set forth in detail below, the Castle Defendants intentionally circumvent the maximum allowable fee by making false, misleading, and deceptive statements about the actual costs they incur in processing a foreclosure to obtain millions of dollars in unjust enrichment, either through manipulating the invoicing of an affiliated entity or through misrepresentations of fees as costs.

¶47 Accordingly, I cannot say that the district court's understanding of the State's allegations was incorrect or so extraordinary as to warrant this court's immediate intervention. To the contrary, the court's understanding was consistent with the State's allegations as reflected in the amended complaint. As a result, even were I not inclined to dismiss these appellate proceedings, I would discharge the order to show cause.

## III.  Conclusion

For these reasons, I respectfully dissent.

I am authorized to state that JUSTICE HOOD joins in this dissent.